### SANTINA DI TERESI ET AL. *v.* STAMFORD HEALTH SYSTEM, INC., ET AL.
### (AC 33052)

Beach, Bear and Schaller, Js.

Argued November 15, 2012—officially released April 23, 2013

*Richard Lewis*, with whom were *Christine D. Salmon* and, on the brief, *Stephen A. Finn*, for the appellant (plaintiff Virginia Di Teresi).

*Eric J. Stockman*, with whom, on the brief, was *Vimala B. Ruszkowski*, for the appellees (named defendant et al.).

*Opinion*

BEACH, J. The issues presented in this appeal arise from the allegedly inadequate response of the defendant hospital to a report of a sexual crime committed against one of its vulnerable patients. The questions we must resolve all pertain to whether the hospital can be held liable to a patient's daughter, her primary caregiver, for emotional trauma that she suffered in the aftermath of the assault and which she attributes, in part, to the hospital's handling of the incident. The trial court rendered summary judgment in favor of the hospital on all of the causes of action asserted by the patient's daughter. She now appeals. We affirm the judgment of the trial court.

The facts, as determined from the pleadings and materials submitted in relation to the motion for summary judgment, are as follows. On March 23, 2004, the named plaintiff, Santina Di Teresi (Santina), a mostly noncommunicative ninety-two year old woman suffering from dementia, advanced Alzheimer's disease, Parkinson's disease, and other ailments, was victimized by

a hospital employee at the defendant Stamford Hospital (hospital),[1] where she was being treated as a "total care patient."[2] The assault, perpetrated by a certified nurse's assistant, Robert Mayes, occurred at approximately 10 a.m.[3] The assault was interrupted when a nurse, Latrina Futrell-Annosier, happened into Santina's hospital room and discovered the untoward event. Futrell-Annosier, shocked, retreated from Santina's room after a few seconds and went to get help. Left alone for a period of time, Mayes washed Santina's linens and disposed of her hospital gown, thus eliminating the possibility of collecting physical evidence from these items. Mayes was escorted from the hospital at about 11 or 11:30 a.m.

Santina's daughter, Virginia Di Teresi (Virginia), arrived at the hospital at about 2 or 2:30 p.m., as was her routine. By this time, Santina had been transferred to a different room, closer to the nurses' station. Virginia was closely involved in her mother's care, visited her frequently and held a power of attorney for her. For the next three hours, Virginia sat with her mother. Unaware that the assault had occurred, Virginia nonetheless noticed that her mother was "disturbed, agitated and restless." At about 5 or 5:30 p.m., three hospital employees came to see Virginia in her mother's hospital room, removed her to an office and related to her the details of what Mayes reportedly had done. At approximately

[1] The defendant Stamford Health System, Inc., is the parent corporation of Stamford Hospital. We refer to these entities collectively as the hospital. Robert Mayes was also named as a defendant, but he is not a party to this appeal.

[2] The "total care patient" status is used by the hospital to designate patients who are unable to care for themselves. Santina had been admitted to the hospital on March 9, 2004.

[3] Mayes was ultimately convicted of two counts of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (B) and (C), and one count of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A).

the same time, hospital employees informed Santina's primary care physician, Santi Neuberger, of the assault. Upon learning of the incident, Virginia was extremely distraught. She attributed her distress not only to the fact that the incident had occurred, but also to the manner in which it was handled by the hospital and belatedly communicated to her.[4] Virginia stated that her grief was compounded by the fact that she had been deprived of the ability to comfort her mother and ensure that she was adequately cared for in the aftermath of the assault.

During the hours between the incident and Virginia's being apprised of it, news of the incident made its way up the hospital's chain of command. Representatives from the hospital's risk management committee, human resources department and security staff met and discussed the appropriate response to the alleged assault, including, specifically, when to contact the Stamford police. The hospital contacted outside legal counsel, who advised the hospital to obtain a statement from Mayes, to report the incident to the police and to conduct a rape examination of Santina.

Following the advice of its attorneys, the hospital called Mayes at approximately 3 p.m. and asked him to return to the hospital. He arrived at about 4 p.m. and met with the hospital's head of security and an employee from human resources, who confronted him with the nurse's accusations. Mayes denied the allegations, stating that he had worked at the hospital for nine years and would never do such a thing. The Stamford police department was contacted at approximately 4:30 p.m.[5] The hospital administered a rape kit examination of Santina at approximately 9 p.m.

---

[4] Virginia later sought psychiatric treatment, and was diagnosed with post-traumatic stress disorder.

[5] There is some dispute over whether the Stamford police department was first contacted at about 4 or 8:45 p.m. The police report indicates that the hospital contacted the police department at about 4 p.m., though the

Although the basic factual contours of what occurred on March 23, 2004, are not in dispute, the parties interpret the hospital's actions in the hours following the assault quite differently. From Virginia's perspective, the hospital deliberated for an unacceptably long time before addressing the alleged assault because, according to Virginia, its "primary concern was the negative impact this assault would have on its reputation and its potential liability." While the hospital considered only its reputation, Virginia alleged, Santina was not adequately cared for because none of the nurses who treated her that day were apprised of the assault and her primary care physician was not contacted until late in the afternoon. Virginia asserts that the hospital's response to the incident constituted a cover-up.[6]

The hospital counters that this characterization of its response to the assault is unfair. It claims that investigating an assault of this nature presented "an entirely novel situation."[7] As such, the hospital, in its view, acted deliberately in investigating the claim, in part to ensure that the rights of Mayes and Futrell-Annosier were respected.

On March 22, 2006, Virginia and Santina commenced this action against the hospital, Stamford Health System, Inc., and Mayes, asserting nineteen causes of action, six on behalf of Virginia and thirteen on behalf

deposition of a police officer called into question the accuracy of this aspect of the report. The court found, and we agree, that the exact time that the hospital contacted law enforcement is not a material fact for summary judgment purposes.

[6] In this regard, Virginia notes that when the hospital's head of security, Tim Burgunder, and an employee from human resources met with Mayes at about 4 p.m., Burgunder allegedly told Mayes that if he explained what happened, the incident could be handled internally. According to Virginia, Burgunder's offer demonstrates the hospital's desire to conceal the assault.

[7] The hospital asserts that there had not been a reported sexual assault at Stamford Hospital since at least 1972, and perhaps never.

of Santina.[8] The hospital moved for summary judgment on twelve of the counts. The trial court, *Hon. Kevin Tierney*, judge trial referee, granted the hospital's motion in its entirety. This appeal followed; it challenges only the court's decision rendering summary judgment as to Virginia's counts.[9] Those counts sound in negligent infliction of emotional distress, intentional infliction of emotional distress, recklessness, violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and breach of fiduciary duty.[10] We discuss each count in turn.

"The standard of review of a trial court's decision granting summary judgment is well established. Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *LaFlamme* v. *Dallessio*, 261 Conn. 247, 250, 802 A.2d 63 (2002).

---

[8] Santina died on January 27, 2008. The co-executors of her estate, namely, Virginia and Emmanuel J. Di Teresi, have been substituted as plaintiffs for Santina in this action.

[9] We emphasize that our review of the court's rendering of summary judgment as to Virginia's causes of action reflects the unique concerns presented by those claims against the hospital and expresses no opinion as to the propriety of the disposition of any of Santina's causes of action.

[10] Five of the six counts asserted by Virginia are at issue in this appeal; the sixth was stricken on a motion to strike. See footnote 14 of this opinion.

I

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Virginia first claims that the court erred by granting the hospital's motion for summary judgment on her claim alleging negligent infliction of emotional distress.[11] Specifically, Virginia takes issue with the court's determination that her emotional injuries were not a foreseeable consequence of the delay in reporting to her the alleged sexual assault of her mother, and additionally contends that the court misconstrued her claim as a bystander emotional distress claim. We disagree with the court's analysis, but nonetheless conclude, because of public policy concerns, that the hospital did not owe a duty to Virginia to report the incident to her more promptly than it did.

The determination of whether a duty exists to a plaintiff "is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." 2 D. Pope, Connecticut Actions and Remedies, Tort Law (1993) § 25:05.

"Our Supreme Court has stated that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general

---

[11] Many of the allegations under this count recited facts pertaining to the hospital's alleged failures adequately to care for Santina after her assault, promptly to notify the Stamford police and to preserve evidence of the crime. The allegations that relate directly to Virginia's emotional distress were that the hospital withheld information concerning the sexual assault from her, and that the hospital knew or should have known that the withholding of such information, together with the hospital's allegedly negligent treatment of Santina, created an unreasonable risk of causing Virginia emotional harm.

nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Internal quotation marks omitted.) *Hollister* v. *Thomas*, 110 Conn. App. 692, 699, 955 A.2d 1212, cert. denied, 289 Conn. 956, 961 A.2d 419 (2008). In claims of negligent infliction of emotional distress, the narrower inquiry as to foreseeability is whether "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) *Maloney* v. *Conroy*, 208 Conn. 392, 398, 545 A.2d 1059 (1988). "This condition differs from the standard foreseeability of the risk of harm requirement for negligence liability . . . in that it focuses more precisely upon the nature of the harm to be anticipated as a prerequisite to recovery . . . ." Id.

Foreseeability alone is not enough to establish a legal duty. "Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world." (Internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 576, 717 A.2d 215 (1998). "[T]he issue of foreseeability cannot be neatly compartmentalized and considered wholly separate from the policy issues that are central to our legal determination of duty." Id. "[I]mposing liability for consequential damages often creates significant risks of affecting conduct in ways that are

undesirable as a matter of policy. Before imposing such liability, it is incumbent upon us to consider those risks." (Internal quotation marks omitted.) Id., 579.

Even if we assume that it is foreseeable that a delay in reporting an incident of this nature to a close family member may cause emotional distress of a magnitude that might cause illness or bodily harm; cf. *Maloney* v. *Conroy*, supra, 208 Conn. 401 ("it takes no great prescience to realize that friends or relatives of a seriously injured accident victim will probably be affected emotionally in some degree"); public policy concerns militate against imposing a duty under the facts of this case. In determining whether the hospital owed a duty to report an incident of this nature to Virginia more promptly than it did, we must consider whether imposing liability creates unduly burdensome collateral risks. See *Lodge* v. *Arett Sales Corp.*, supra, 246 Conn. 576. Because we conclude that recognition of a duty to report more promptly than occurred in this case would incentivize potentially detrimental behavior, we hold that liability ought not be imposed on the hospital.[12]

Virginia's claim of negligent infliction of emotional distress implicates several aspects of our negligence jurisprudence which advise a cautious approach to the imposition of liability.[13] Our decision is informed by three lines of precedent: the first involves the limited duty owed by health care providers to third parties; the second deals with negligent infliction of emotional

[12] The hospital concedes that it had a duty to Santina to inform her physician, the police and her attorney in fact of an assault of the sort that occurred here. The hospital disputes that it had a duty to inform Virginia, in her personal capacity, of the alleged assault any sooner than it did.

[13] Although our Supreme Court has sometimes utilized a four factor framework for evaluating whether public policy concerns support the existence of a legal duty; see, e.g., *Jarmie* v. *Troncale*, 306 Conn. 578, 603, 50 A.3d 802 (2012); we need not undertake such an analysis here because of our reliance on cases addressing the costs and benefits of imposing a legal duty in similar factual scenarios.

distress claims arising from medical malpractice; and the third addresses the consequences of imposing liability for a failure to report or a delay in reporting.

We thus begin our analysis mindful of the Supreme Court's admonition that we should exercise "restraint when presented with opportunities to extend the duty of health care providers to persons who are not their patients." *Jarmie* v. *Troncale*, 306 Conn. 578, 592, 50 A.3d 802 (2012); see id., 589 (physician owes no duty to third party victim to inform patient of compromised ability to drive because of patient's impaired medical condition); see also id., 593 (cataloguing cases where Supreme Court has declined to find that health care providers owed duty of care to third parties).

Next, although the trial court improperly characterized Virginia's claim as a bystander emotional distress claim in the context of observed medical malpractice, a cause of action not recognized in Connecticut; see *Maloney* v. *Conroy*, supra, 208 Conn. 392; the concerns that led our Supreme Court to reject the bystander cause of action lend support to our decision today.[14] In *Maloney*, the Supreme Court held that a person who is present while a family member receives deficient medical care may not recover under a bystander theory of negligent infliction of emotional distress. Id., 397. The plaintiff in *Maloney* alleged that her mother's death was caused by her doctors' negligence, and that the plaintiff's emotional distress was compounded by the

---

[14] We note that, among the claims asserted against the hospital by the estate of Santina, is a medical malpractice claim, alleging, among other things, that the hospital failed to adequately monitor Mayes and promptly to provide Santina with medical treatment following the assault. Additionally, Virginia asserted a bystander negligent infliction of emotional distress claim against the hospital based on her presence during her mother's rape examination. The trial court, *Tobin, J.*, granted the hospital's motion to strike this claim. This ruling is not being challenged in this appeal.

doctors' failure to investigate symptoms that the plaintiff brought to their attention as evidence of her mother's declining condition. Id., 394. Essentially, the plaintiff asked the court to recognize a cause of action for situations in which the plaintiff was present and cognizant that medical malpractice was being committed with respect to a close family member. Id., 397.

The Supreme Court held that such claims were not cognizable. Justice Shea, writing for the court, recounted the skepticism that has traditionally attended stand-alone claims of emotional distress: "Because the etiology of emotional disturbance is usually not as readily apparent as that of a broken bone following an automobile accident, courts have been concerned, apart from the problem of permitting bystander recovery, that recognition of a cause of action for such an injury when not related to any physical trauma may inundate judicial resources with a flood of relatively trivial claims . . . and that liability may be imposed for highly remote consequences of a negligent act." Id., 397–98.

The emotional distress cause of action urged by the plaintiff in *Maloney* presented a particularly "troublesome question of causation"—namely, that it would be difficult to distinguish whether the plaintiff's distress was the result of natural grief over her mother's death, which may have occurred even in the absence of malpractice, or, as the plaintiff alleged, "from the effects upon her feelings of her belief that the suffering and death of her mother were attributable to the defendants' wrongful conduct." Id., 399. Similarly here, it would be very difficult to parse whether Virginia's emotional distress was caused by the fact of her mother's having been victimized in this way, which could have been caused without any negligence on the hospital's part, or whether her anguish was caused by the hospital's allegedly deficient response. Indeed, when asked during her deposition what the basis was for her emotional

distress, Virginia stated: "It's hard to answer that. There's just so many issues involved. . . . [T]here are many issues involved pertaining to this case that are causing me great, great emotional and mental stress and harm besides the assault itself . . . ." This understandable difficulty in isolating causation is another reason that we decline to hold that the hospital had a duty to Virginia to report more promptly what had happened to her mother.[15]

Our public policy analysis is also informed by concerns raised in other duty to report cases. In *Hollister*, for example, a firefighter sued a homeowner and contractors who delayed in calling the fire department after a fire started during a condominium renovation project. *Hollister* v. *Thomas*, supra, 110 Conn. App. 695–96. The homeowner was reluctant to summon emergency services because she had not obtained the requisite permits for the project and because there was an illegal structure in her condominium. Id., 696. As a consequence of the delay, the blaze had reached an advanced state by the time firefighters arrived. Id. Rushing to the scene, the plaintiff-firefighter sustained a serious, and likely permanent, knee injury. Id. The firefighter sued, alleging that the homeowner owed him a duty of care to promptly report the fire. Id., 699. The trial court granted the defendant-homeowner's motion to strike on the ground that she did not owe the plaintiff a duty of care and this court affirmed. Id., 696, 704. Among other reasons for declining to impose a duty of more prompt

---

[15] To the extent that the hospital's delay in informing Virginia is indicative of a larger pattern of inattentiveness to Santina in the aftermath of the assault, such actions may be relevant to Santina's claims against the hospital. Cf. *Maloney* v. *Conroy*, supra, 208 Conn. 403 (daughter's unsuccessful attempts to bring to doctors' attention her mother's declining condition may have been relevant to determination of whether there had been malpractice, but "[i]t is . . . the consequences to the patient, and not to other persons, of deviations from the appropriate standard of medical care that should be the central concern of medical practitioners").

reporting, we noted that, "[a]s a matter of public policy . . . a finding of liability in response to a delay in reporting an emergency could deter an individual from reporting an emergency at all if that person thought that too much time had passed." Id., 703–704.

Similar concerns are germane here. Although Virginia may have wanted to have been informed immediately of the alleged assault, the hospital had a countervailing obligation to investigate Futrell-Annosier's allegations and to devise a plan for dealing with its accused employee, Mayes. Health care providers may be reluctant to report such incidents at all if a delay of only a few hours could be a basis for liability to the victim's family members. Moreover, imposing liability when such an incident is reported within hours of its occurrence incentivizes rash reporting. A false or incomplete report of an incident of this nature would undoubtedly have caused Virginia entirely unwarranted emotional distress as well.

A related concern is that imposing liability when only a few hours have passed between the incident and the reporting could lead hospitals, in an attempt to "shield themselves from liability," to "report all potential claims rather than [exercise] the requisite amount of discretion to determine the validity of such claims." *Ward* v. *Greene*, 267 Conn. 539, 560, 839 A.2d 1259 (2004).[16] And, overreporting for fear of legal action can distract hospital employees from their primary responsibility of treating patients. See *Maloney* v. *Conroy*, supra, 208 Conn. 403 ("[t]he focus of the concern of medical care practitioners should be upon the patient and any diversion

---

[16] Licensed medical professionals have an obligation to report the suspected abuse or neglect of a person with an intellectual disability within seventy-two hours. See General Statutes § 46a-11b (a). Similarly, licensed medical professionals and other employees of nursing home facilities have an obligation to report the suspected abuse, neglect, exploitation or abandonment of elderly persons within seventy-two hours. See General Statutes § 17b-451 (a).

of attention or resources to accommodate the sensitivities of others is bound to detract from that devoted to patients"). For these public policy reasons, we conclude that the hospital did not have a duty to report the sexual assault of Santina to her daughter Virginia more promptly than it did.

## II

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Virginia next claims that the court erred by granting the defendant's motion for summary judgment on her count claiming intentional infliction of emotional distress. Virginia's claim of intentional infliction of emotional distress alleged a concealment of the sexual assault, which consisted of a delay in informing Santina's primary care physician, Virginia, and the Stamford police of the assault. Virginia further alleged that the hospital "knew or should have known that severe emotional distress was likely to result from [this] conduct." In granting the hospital's summary judgment motion, the court held that the hospital's conduct in responding to the assault was not extreme and outrageous.[17]

"In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3)

---

[17] The court also found that the count in Virginia's complaint alleging intentional infliction of emotional distress was "in effect a bystander emotional distress claim in a medical malpractice case," which is not recognized by Connecticut law. As discussed previously, we disagree with this characterization of Virginia's claims, but for the reasons set forth, nonetheless hold that summary judgment was proper.

that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. . . . Only where reasonable minds disagree does it become an issue for the jury." (Citation omitted; internal quotation marks omitted.) *Gagnon* v. *Housatonic Valley Tourism District Commission*, 92 Conn. App. 835, 846, 888 A.2d 104 (2006); see also *Hartmann* v. *Gulf View Estates Homeowners Assn., Inc.*, 88 Conn. App. 290, 295, 869 A.2d 275 (2005) ("[I]n assessing a claim for intentional infliction of emotional distress, the court performs a gatekeeping function. In this capacity, the role of the court is to determine whether the allegations of a complaint . . . set forth behaviors that a reasonable fact finder could find to be extreme or outrageous.").

The threshold inquiry in an intentional infliction of emotional distress action is, therefore, whether the alleged behavior is sufficiently extreme and outrageous. This high bar for distasteful behavior has been described as requiring "conduct . . . so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" (Internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 443, 815 A.2d 199 (2003).

We agree with the court that the conduct at issue cannot be fairly characterized as extreme and outrageous. Even if the delay in informing Virginia was motivated in part by public relations or pecuniary concerns, there is no evidence that the hospital intended to inflict

emotional distress on her. Moreover, as we previously explained, the hospital took a relatively short time to investigate unique, in its experience, allegations of sexual assault by an employee. After substantiating the allegations, consulting with outside legal counsel and interviewing the accused, Virginia was informed of what reportedly had transpired. This occurred approximately seven hours after the incident had occurred. A delay of this nature does not constitute behavior that is outside "all possible bounds of decency." Cf. 1 D. Pope, Connecticut Actions and Remedies, Tort Law (1993) § 6:03 ("[i]f the defendant's act is merely negligent, even negligence of an aggravated sort, the correct action is negligent infliction of mental distress").

Our conclusion is supported by *Carrol* v. *Allstate Ins. Co.*, supra, 262 Conn. 443. In *Carrol*, the plaintiff filed a claim for fire damage pursuant to a homeowner's insurance policy with the defendant after a container, inadvertently filled with gasoline instead of kerosene, combusted in the plaintiff's basement. Id., 435–36. The defendant refused to reimburse the plaintiff for a portion of his losses because its investigators had concluded that the cause of the fire was arson. Id., 436–37. The plaintiff brought an action, alleging, inter alia, breach of the insurance contract and intentional infliction of emotional distress. To support his claim of intentional infliction of emotional distress, the plaintiff had presented evidence at trial that the defendant's investigation had not been thorough, and that investigators had deliberately ignored critical evidence demonstrating that the fire was not the result of arson. Id., 439–41. The plaintiff additionally testified that one of the defendant's investigators may have been dismissive of the plaintiff's claim because he was African-American. Id., 441.

The jury awarded punitive damages to the plaintiff on his claim of intentional infliction of emotional distress, but the Supreme Court reversed on the ground

that there was insufficient evidence that the defendant's conduct was extreme and outrageous. Id., 444. The court concluded that "[t]he plaintiff produced evidence that the defendant did not conduct a thorough or reasoned investigation and may have decided too quickly that the fire had been set deliberately. As distressing as this insurance investigation may have been to the plaintiff, however, it simply was not so atrocious as to trigger liability for *intentional* infliction of emotional distress." (Emphasis in original.) Id.

Similarly, the allegations in this case, interpreted in the light most favorable to Virginia, are not so "atrocious" as to rise to the level of conduct that makes out a claim for intentional infliction of emotional distress. As in *Carrol*, Virginia alleged here that an investigation was conducted in such a way as to protect the hospital's interests, both reputational and financial. Those interests allegedly outweighed the hospital's obligation promptly to inform Virginia of what had happened to her mother. Even if the delay was caused by a temporary desire to "cover up" the incident, however, and not by the legitimate need to investigate very serious allegations, the fact remains that Virginia was informed of the assault within hours after it happened. Given the relatively short period of time that elapsed before the hospital reported the incident to Virginia, the court properly rendered summary judgment in favor of the hospital on her intentional infliction of emotional distress count.

## III

### COMMON-LAW RECKLESSNESS

Virginia next claims that the court erred by rendering summary judgment in favor of the hospital on her cause of action alleging recklessness. In her complaint, Virginia incorporated the allegations of all of her other

causes of action—including the actions previously discussed here, negligent and intentional infliction of emotional distress—and additionally alleged that the "hospital's conduct . . . was deliberate and/or reckless and demonstrated a reckless disregard for the rights of Virginia Di Teresi." The court concluded that the "failure to inform Virginia . . . is not an extreme departure from ordinary care." We agree.

"In order to establish that the defendants' conduct was wanton, reckless, wilful, intentional and malicious, the plaintiff must prove, on the part of the defendants, the existence of a state of consciousness with reference to the consequences of one's acts . . . . [Such conduct] is more than negligence, more than gross negligence. . . . [I]n order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . [In sum, such] conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Internal quotation marks omitted.) *Elliott* v. *Waterbury*, 245 Conn. 385, 415, 715 A.2d 27 (1998). "It is at least clear . . . that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention . . . ." (Internal quotation marks omitted.) *Dubay* v. *Irish*, 207 Conn. 518, 533, 542 A.2d 711 (1988).

For many of the reasons already discussed, we do not characterize the hospital's response to the assault as "an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." (Internal quotation marks omitted.) *Elliott* v. *Waterbury*, supra,

245 Conn. 415. Virginia's recklessness cause of action is essentially a recapitulation of her allegations of negligence.[18] Because of the "wide difference between negligence and a reckless disregard of the rights or safety of others . . . [m]erely using the term recklessness to describe conduct previously alleged as negligence is insufficient as a matter of law." (Citation omitted; internal quotation marks omitted.) *Angiolillo* v. *Buckmiller*, 102 Conn. App. 697, 705, 927 A.2d 312 (2007); see also *Dumond* v. *Denehy*, 145 Conn. 88, 91, 139 A.2d 58 (1958) ("[a] specific allegation setting out the conduct that is claimed to be reckless or wanton must be made").

IV

CUTPA

Virginia next claims that the court improperly granted the hospital's motion for summary judgment as to her CUTPA claim. The court rendered summary judgment as to the CUTPA claim on two grounds: (1) that Virginia was not in a business relationship with the hospital and (2) that she did not sustain an ascertainable loss. This court having already concluded that the hospital did not owe a legal duty to Virginia to report the sexual assault to her more promptly, her CUTPA claim must also fail. Therefore, we need not address whether Virginia's relationship with the hospital provides standing to sue under CUTPA, or whether her purely emotional injuries constitute an "ascertainable loss."

We begin our analysis of Virginia's CUTPA action by noting that, "[a]lthough physicians and other health care providers are subject to CUTPA, only the entrepreneurial or commercial aspects of the profession are covered"; *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964 (1997); that is, "[m]edical

---

[18] Virginia's recklessness count also incorporates her *intentional* infliction of emotional distress claim, but, as we discussed previously, the alleged delay here did not rise to the level of conduct that makes out such a claim.

malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation." Id., 38. We interpret Virginia's CUTPA claim, generously, to be that the hospital made a commercial decision to withhold information regarding the assault from her because of concerns that negative publicity would ensue if the assault was made public. We do note that if the hospital's delay reflected a commercial decision, as Virginia alleged, it maintained such a strategic direction only for a few hours before communicating the allegations to her. Assuming, for the sake of argument, that any delay in reporting was motivated by the hospital's public relations concerns, our decision that the hospital owed no duty to report the allegations to Virginia more promptly forecloses recovery under CUTPA.

"[A]s a general matter, the existence of a duty is not a prerequisite to a finding of a CUTPA violation. When a plaintiff alleges that a defendant's *passive* conduct violates CUTPA, however, common sense dictates that a court should inquire whether the defendant was under any obligation to do what it refrained from doing." (Emphasis in original.) *Downes-Patterson Corp.* v. *First National Supermarkets, Inc.*, 64 Conn. App. 417, 427, 780 A.2d 967 (no CUTPA violation for failure to sign release of restrictive covenant where defendant was not required to relinquish such interest), cert. granted on other grounds, 258 Conn. 917, 782 A.2d 1242 (2001) (appeal dismissed June 25, 2002).

The hospital was under no duty to report the incident to Virginia sooner than it did; thus, "common sense dictates"; id.; that its failure to do so cannot be the basis of a CUTPA violation. Moreover, the purpose of CUTPA is to protect the public from unfair trade practices, and "whether a practice is unfair depends upon the finding of a violation of an identifiable public policy." *Daddona* v. *Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 257, 550 A.2d 1061 (1988). As we have

explained, public policy concerns do not support impos-
ing a duty to report an incident of this nature before a
hospital has had some reasonable period of time to
investigate the allegations. Therefore, summary judg-
ment was properly rendered as to Virginia's CUTPA
count.

V

BREACH OF FIDUCIARY DUTY

Virginia finally claims that the court improperly ren-
dered summary judgment in favor of the hospital as to
her cause of action alleging breach of fiduciary duty.
In her complaint, Virginia alleged that the hospital owed
a fiduciary duty directly to her. The precise nature of
the duty purportedly owed to Virginia was described
more thoroughly in her brief: "[t]he [h]ospital had a
duty to deal honestly and in good faith with Virginia, the
only person authorized to make decisions concerning
Santina's medical care and treatment, and to not place
its own interests above hers." Virginia's assertion of a
fiduciary relationship with the hospital does not, how-
ever, derive only from her status as her mother's attor-
ney in fact. She additionally urges that "her decision
to engage the [h]ospital's services and to place her trust
and confidence in the [h]ospital placed her in a direct
relationship with the [h]ospital." Thus, Virginia's claim
seems to be that the hospital's fiduciary duty to her
was breached when the hospital allegedly let its self-
interest dictate its response to her mother's victimiza-
tion—that is, the delay in informing Virginia of the
assault was motivated by the hospital's desire to avoid
liability and negative publicity. The court found that
the hospital did not have a fiduciary relationship with
Santina; therefore, it concluded that the power of attor-
ney exercised by Virginia could not establish a fiduciary
relationship with the hospital.

"[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 195, 896 A.2d 777 (2006). The universe of fiduciary relationships is not static. "Rather than attempt to define a fiduciary relationship in precise detail and in such a manner to exclude new situations, we have instead chosen to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." (Internal quotation marks omitted.) *Dunham* v. *Dunham*, 204 Conn. 303, 320, 528 A.2d 1123 (1987), overruled in part on other grounds by *Santopietro* v. *New Haven*, 239 Conn. 207, 213 n.8, 682 A.2d 106 (1996). "[A]lthough we have not *expressly* limited the application of . . . traditional principles of fiduciary duty to cases involving only fraud, self-dealing or conflict of interest, the cases in which we have invoked them have involved such deviations." (Emphasis in original; internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, supra, 196.

The court concluded that the hospital was not acting as a fiduciary in its relationship with Santina because of a dearth of Connecticut cases finding such a legal relationship. A fortiori, the court found that a fiduciary relationship could not have existed between the hospital and Virginia. The court cited *Sherwood* v. *Danbury Hospital*, supra, 278 Conn. 163, for the proposition that a hospital generally does not function in a fiduciary capacity with its patients. But *Sherwood* did not negate, as a matter of law, the possibility that such a fiduciary relationship can exist in other circumstances. Instead, the Supreme Court concluded that the plaintiff-patient's nonemployee treating physician, and not the hospital,

owed the patient a duty of care to inform the plaintiff of the risks of contracting HIV from a blood transfusion performed at a hospital during a surgical procedure. Id., 192; see id., 185–86 ("it is solely the responsibility of the nonemployee treating physician, and not the duty of the hospital, to inform the patient of the risks and benefits of, and alternatives to, a proposed medical procedure"). "[I]t is not the hospital but the patient's physician who, by virtue of his or her relationship with the patient and knowledge of the patient's medical condition and history, can best advise the patient . . . ." Id., 187. In these circumstances, the court noted that the plaintiff "provided scant reason to conclude that a hospital owes a patient the duty of a fiduciary." Id., 196. The court went on to say that, even assuming there was a fiduciary relationship between the hospital and the patient, the plaintiff "failed to demonstrate why the duty encompassed the responsibility of informing the plaintiff of the risks associated with a blood transfusion." Id.

The facts of *Sherwood* are markedly different from the facts here. Santina checked into the hospital not for a discrete procedure to be performed by a nonemployee physician, but for comprehensive care. Moreover, Virginia's claim of breach of fiduciary duty does not arise from a failure to disclose the risks associated with a particular medical procedure, but from the hospital's alleged failure to adequately respond to Santina's sexual assault. We do not raise these issues in an attempt to decide whether a fiduciary duty did in fact exist between the hospital and Santina. Virginia's assertion of a fiduciary relationship, however, cannot be rejected on the ground that the hospital could not, as a matter of law, have been acting as a fiduciary in its relationship with Santina.[19]

---

[19] Although our Supreme Court has not definitively addressed this issue, other states have recognized that a fiduciary relationship can exist between a hospital and a patient. See B. Furrow, "Patient Safety and the Fiduciary Hospital," 1 Drexel L. Rev. 439, 459–63 (2009); see also *Wohlgemuth* v.

Assuming, arguendo, that a fiduciary relationship did exist between the hospital and Virginia, we nonetheless find no issue of genuine fact as to whether the hospital's conduct, vis-à-vis Virginia, constituted "fraud, self-dealing or conflict of interest . . . ." Id. To be sure, "the possible concealment of a fiduciary's own wrongdoing egregious enough to give rise to a legal claim seems particularly the type of behavior that the law requires the fiduciary to explain." *Martinelli* v. *Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 422 (2d Cir. 1999) (applying Connecticut fiduciary law). Moreover, as the United States Court of Appeals for the Second Circuit has observed, "[a] fiduciary obtains an obvious benefit if the person to whom it owes a fiduciary duty delays bringing a cause of action against the fiduciary beyond the expiration of the statute of limitations [because] [t]he claim against the fiduciary is forever barred." Id. Here, however, any delay motivated by the hospital's purported self-interest did not compromise Virginia's ability to prosecute an action against the hospital. Thus, it is difficult to surmise what benefit accrued to the hospital by a period of delay of a few hours, during one business day.[20] For this alternative reason, summary judgment was properly rendered as to Virginia's breach of fiduciary duty count.

The judgment is affirmed.

In this opinion the other judges concurred.

---

*Meyer*, 139 Cal. App. 2d 326, 331, 293 P.2d 816 (1956) ("The doctor-patient relationship is a fiduciary one and it is incumbent on the doctor to reveal all pertinent information to his patient. The same is true of the hospital-patient relationship.").

[20] Virginia also argues that the hospital breached a fiduciary duty to her, in her capacity as her mother's attorney in fact, to fulfill her responsibilities as the primary decision maker for her mother's health care. Those claims, however, are indistinguishable from Santina's action for breach of fiduciary duty; indeed, this count also alleged that the hospital withheld information from Virginia. Thus, Virginia's breach of fiduciary duty action related to her role as her mother's attorney in fact essentially appropriates claims related to the postassault treatment of Santina and therefore can only be asserted by her.