******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CLARENCE MARSALA ET AL. *v.* YALE-NEW HAVEN
HOSPITAL, INC.
(AC 37822)

CLARENCE MARSALA, ADMINISTRATOR (ESTATE
OF HELEN MARSALA) *v.* YALE-NEW HAVEN
HOSPITAL, INC.
(AC 37821)

Beach, Keller and Bishop, Js.

*Argued March 10—officially released June 28, 2016*

(Appeal from Superior Court, judicial district of
Ansonia-Milford, Lee, J. [motion to strike]; Tyma, J.
[summary judgment in each case].)

*Jeremy C. Virgil*, for the appellants (plaintiff Michael
Marsala et al. in AC 37822, plaintiff in AC 37821).

*Tadhg A.J. Dooley*, with whom was *Jeffrey R. Babbin*,
for the appellee in both appeals (defendant).

*Opinion*

BISHOP, J. These consolidated appeals arise from the death of Helen Marsala while under the care of the defendant, Yale-New Haven Hospital, Inc. (Hospital). In the case that underlies AC 37822, there were several plaintiffs. Helen's husband, Clarence Marsala, in his personal capacity and as administrator of Helen's estate, and Helen's five children, Michael Marsala, Gary Marsala, Tracey Marsala, Kevin Marsala, and Randy Marsala, filed a twenty-seven count complaint, including, inter alia, claims of negligent infliction of emotional distress, intentional infliction of emotional distress, wrongful death, loss of consortium, and medical malpractice. On October 30, 2013, the court, *Lee, J.*, granted the Hospital's motion to strike the negligent infliction of emotional distress counts and, on March 19, 2015, the court, *Tyma, J.*, rendered summary judgment in favor of the Hospital on the intentional infliction of emotional distress counts. The claims for wrongful death, loss of consortium, and medical malpractice are pursued solely by Clarence, in his personal capacity and as administrator, and as they remain pending before the trial court, they are not subject to this appeal. Consequently, because all the claims Clarence brought were not disposed of by the trial court's actions, he is not a party to the appeal designated as AC 37822.[1]

In sum, in AC 37822, the plaintiffs, Helen's five children, appeal from the decisions striking their negligent infliction of emotional distress claims and rendering summary judgment on their intentional infliction of emotional distress claims.

In the case that underlies AC 37821, Clarence, as administrator of Helen's estate, filed a separate action alleging medical malpractice by the Hospital. On March 19, 2015, the court, *Tyma, J.*, rendered summary judgment in favor of the Hospital in that action on the ground that the medical malpractice claim comprising that action was duplicative of the wrongful death, loss of consortium, and medical malpractice counts that Clarence, in his personal capacity and as administrator, was still actively pursuing in the case underlying AC 37822. Judge Tyma reasoned that Clarence's claims in both cases were identical and arose from the same factual allegations, which rendered his claim in the case underlying AC 37821 legally insufficient under *Floyd* v. *Fruit Industries, Inc.*, 144 Conn. 659, 669, 136 A.2d 918 (1957) (Limiting recovery to one action "where damages for death itself are claimed in an action based on our wrongful death statute, recovery of any ante-mortem damages flowing from the same tort must be had, if at all, in one and the same action. In other words, there cannot be a recovery of damages for death itself under the wrongful death statute in one action and a recovery of ante-mortem damages, flowing from the same tort, in another action . . . .") AC 37821 is Clarence's appeal

from that judgment. Clarence has not raised or briefed any challenge to the summary judgment rendered in the separate action. Accordingly, we deem the appeal in AC 37821 to be abandoned and we address, only, the issues raised in AC 37822; see *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, 302 Conn. 263, 279–80, 25 A.3d 632 (2011) (holding claims are inadequately briefed when parties do not develop claims with analysis); *Connecticut Light & Power, Co.* v. *Gilmore*, 289 Conn. 88, 124, 956 A.2d 1145 (2008) ("[w]e repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief" [internal quotation marks omitted]); and do not address the merits of AC 37821 here. For the reasons stated herein, we affirm the judgments of the trial court.

I

The following allegations from the pleadings, evidence submitted by the parties, and procedural history are relevant to the resolution of this appeal. On April 7, 2010, Helen, then seventy-six years old, was admitted to Griffin Hospital (Griffin) to undergo wrist surgery. After surgery, Helen's wrist became infected and her condition worsened to the point that she was put on life support. She subsequently lost consciousness and became comatose. Helen did not have a living will with instructions concerning her care should she fall into a coma with no reasonable prospects for recovery. However, she had expressed to Clarence her desire to remain on life support should she ever lose the ability to speak for herself while hospitalized. At Griffin, the medical staff came to the view that Helen's condition was irreversible and they recommended to Clarence that Helen be taken off life support. Based on Helen's previous expressions, however, Clarence refused to give consent, and on June 19, 2010, he transferred Helen to the Hospital.

Helen arrived at the Hospital in critical condition. She required a respirator to breathe, received her nutrition through a feeding tube, and, aside from one moment when she opened her eyes, remained unconscious and unresponsive to painful stimuli. Her intake report described Helen as: "A 76 year old woman transferred from Griffin Hospital for multiple medical problems for further management. She has an extensive past medical history, which included [diabetes mellitus], moderate aortic stenosis, hypertension, hyperlipidemia. . . . She has had a long hospital course, which has included prolonged respiratory failure and failure to wean, shock requiring vasopressors, Morganella bacteremia requiring treatment with Impipenem, volume overload, and GI bleeding thought to be due to ischemic colitis." Helen's intake physician summarized her status, stating that her "[p]rognosis is uncertain at best given her multiple medical problems and advanced age."

On the day Helen was admitted to the Hospital, members of its staff discussed with Clarence and Michael the permanent removal of Helen's ventilator. Clarence and Michael refused. Instead, they instructed the Hospital never to "pull the plug." Nonetheless, the conversation continued. Hospital staff repeatedly advised permanently removing Helen's ventilator, and Clarence and other members of the family continually refused to give their consent. Despite objecting to permanently removing Helen's ventilator, Clarence believed that Helen would not want to remain alive at all costs and, accordingly, upon admission to the Hospital, he agreed to keep her status as "Do Not Resuscitate."

Helen's condition worsened during her time at the Hospital. Images of her brain revealed new infarcts, and monitoring of her brain showed slowing. Despite Helen's bleak outlook, the Hospital attempted to help Helen regain consciousness by conducting weaning trials in an attempt to stimulate her respiratory system. The weaning trials involved temporarily removing Helen's ventilator with the hope that her body would then start breathing on its own. Clarence and the plaintiffs did not object to the weaning trials as they hoped that these efforts would lead to some improvement in Helen's mental status. However, Clarence continued to oppose the Hospital's recommendation that Helen's ventilator be permanently removed. Instead, Clarence insisted that the Hospital reintubate Helen if she did not start breathing on her own and not change her status to "Due Not Reintubate." At this time, although Clarence continued to object to changing Helen's status to "Do Not Reintubate," the Hospital kept in place her "Do Not Resuscitate" status.

Due to the disagreement between Clarence and the Hospital physicians over whether to reintubate Helen if her condition did not improve, the Hospital referred Helen's case to its Bioethics Committee (committee). Generally, the committee, a Hospital panel composed of the physicians and social workers familiar with the particular patient, members of the clergy, relevant staff personnel, and health care specialists from the relevant medical fields, is authorized to consider the ethical issues relating to the treatment of patients and to recommend a course of action. In Helen's case, the committee met on July 23, 2010. Although Clarence was invited to participate, he did not attend. The committee noted that Clarence wished to keep Helen alive, despite her poor prognosis. The committee also considered the medical opinion of Helen's physicians who were "concerned that [they were] providing futile care considering [Helen] has had multi-organ failure for several weeks now—respiratory failure, poor mental status, kidney failure, and stage IV skin break down over the back, as well as stage II over the bridge of nose from [her breathing mask, known as a Bilevel Positive Airway

Pressure (BiPAP) mask].''

On July 23, 2010, after considering Helen's prognosis, the views of her medical team, and the views of her family, the committee recommended ''that there be no further escalation of care (meaning no intubation or pressors) considering this is not in the best interest of the patient and we are not providing care that would achieve the patient's goal of going home.'' Finally, a committee member called Clarence and left a voice mail requesting that he discuss the committee's recommendation with her. Clarence did not respond to the committee member's request. In fact, during the final days of Helen's life, Clarence became increasingly difficult to contact. He did not answer his phone and visited the Hospital less frequently.

Following the committee's recommendation, the Hospital sought a second opinion from a pulmonologist, a physician who specializes in the respiratory system, and who had not been involved in Helen's care. The pulmonologist ''concur[red] with the decision of [Helen's] primary [medical] team and of the committee and [stated that] further attempts at therapeutic intervention do not offer a chance of a better outcome.'' Additionally, the pulmonologist stated that ''[r]eintubation, ongoing use of BiPAP based on both asynchrony and skin breakdown is not warranted.'' He further ''agree[d] to moving [Helen] to a comfort care plan.'' Finally, the pulmonologist noted that he had called Clarence and left a message explaining his medical opinion and agreement with the committee's recommendation.

In accordance with the committee's recommendation and buttressed by the second opinion by a pulmonologist, the Hospital changed Helen's status to provide comfort care only and a ''Do Not Reintubate'' order was entered for her in addition to the ''Do Not Resuscitate'' order previously issued. Neither Clarence nor any of the plaintiffs was present at the committee meeting; none of them witnessed the Hospital's decision-making process and none was present when the Hospital made the ultimate decision to transition Helen to comfort care and change her status to ''Do Not Reintubate.''[2] On July 24, 2010, the Hospital permanently removed Helen's ventilator. She died that night.

Subsequently, Clarence, both in his personal capacity and as administrator of Helen's estate, and the plaintiffs brought the action underlying AC 37822 against the Hospital. The initial complaint in that action asserted a variety of claims (twenty-seven counts), all rooted in the core allegation that the Hospital ''ignored the wishes of . . . Helen, as expressed from her next of kin, Clarence . . . prior to removing life support.'' Pertinently, the complaint alleged: negligent infliction of emotional distress alleged by each individual plaintiff (counts one through six), intentional infliction of emotional distress claims alleged by each individual plaintiff (counts seven

through twelve), wrongful death and loss of consortium claims alleged by Clarence in his personal capacity and as administrator (counts twenty-one and twenty-two, respectively), and medical malpractice and loss of consortium claims alleged by Clarence in his personal capacity and as administrator (counts twenty-six and twenty-seven, respectively).[3] Additionally, Clarence, as the administrator of Helen's estate, separately filed the action underlying AC 37821 alleging medical malpractice by the Hospital, premised on the same factual allegations underlying AC 37822.

On March 22, 2013, the Hospital filed a motion to strike most of the counts in the action underlying AC 37822, including the plaintiffs' negligent infliction of emotional distress counts. On October 30, 2013, Judge Lee granted the Hospital's motion to strike the negligent infliction of emotional distress counts. Specifically, Judge Lee determined that the plaintiffs' negligent infliction of emotional distress counts were properly characterized as bystander emotional distress claims, which required the plaintiffs to allege facts tending to show "the[ir] contemporaneous sensory perception of the event or conduct that causes the injury, or by [arrival] on the scene soon thereafter and before substantial change has occurred in the victim's condition or location," as required by our Supreme Court's decision in *Clohessy* v. *Bachelor*, 237 Conn. 31, 56, 675 A.2d 852 (1996). Judge Lee concluded that the plaintiffs had failed to "allege that they witnessed the actual removal of the respirator or the resulting demise of Helen or arrived shortly thereafter" and, accordingly, had not met the pleading standard required by *Clohessy*. Additionally, Judge Lee noted that so far as the plaintiffs' claims sought damages for medical malpractice against the Hospital for its treatment of Helen, such claims were barred by *Maloney* v. *Conroy*, 208 Conn. 392, 392, 545 A.2d 1059 (1988) (holding that bystanders to medical malpractice may not recover for emotional distress). Judgment was entered on the stricken counts.

On August 28, 2014, the Hospital filed a motion for partial summary judgment in the case underlying AC 37822 as to the counts alleging intentional infliction of emotional distress. On March 19, 2015, Judge Tyma granted that motion on the grounds that the claims sounded in bystander intentional infliction of emotional distress claims and such claims were barred by *Maloney* v. *Conroy*, supra, 208 Conn. 392.[4] These consolidated appeals followed. See footnotes 1 and 4 of this opinion.

On appeal in AC 37822, the plaintiffs challenge Judge Lee's decision granting of the Hospital's motion to strike their negligent infliction of emotional distress claims and Judge Tyma's rendering of summary judgment in favor of the Hospital on their intentional infliction of emotional distress claims. Specifically, with respect to Judge Lee's decision to strike their negligent infliction

of emotional distress counts, the plaintiffs challenge his characterization of their allegations as claims of bystander, not direct, emotional distress. The distinction is critical as bystander claims require the plaintiffs to allege that they contemporaneously perceived the Hospital's negligent act or saw its result shortly thereafter. *Clohessy* v. *Bachelor*, supra, 237 Conn. 56. Judge Lee granted the Hospital's motion to strike those counts on the ground that the plaintiffs had failed to allege facts which, if proven, could establish *Clohessy*'s contemporaneous perception requirement. Similarly, the plaintiffs argue that Judge Tyma incorrectly characterized their intentional infliction of emotional distress counts as premised on bystander liability and incorrectly rendered summary judgment in favor of the Hospital on those counts on the ground that bystander claims for emotional distress premised on medical malpractice are precluded under *Maloney* v. *Conroy*, supra, 208 Conn. 392. The plaintiffs argue that *Maloney* was superseded after the court granted the Hospital's motion for summary judgment by *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 113 A.3d 952 (2015). We address each claim in turn.

## II

We first consider the plaintiffs' claim that Judge Lee and Judge Tyma, in their respective decisions, mischaracterized their counts alleging negligent infliction of emotional distress and intentional infliction of emotional distress as raising claims of bystander emotional distress. This claim underlies the plaintiffs' challenges to the courts' actions, and is pivotal to our analysis because bystander emotional distress claims require the pleading and establishing of elements not required for bringing direct claims of emotional distress. See *Clohessy* v. *Bachelor*, supra, 237 Conn. 56. Both courts first concluded that the plaintiffs had raised claims of bystander emotional distress and, then, applying the law controlling such claims to the plaintiffs' claims, granted the Hospital's motion to strike the plaintiffs negligent infliction of emotional distress counts and motion for summary judgment on the plaintiffs' intentional infliction of emotional distress counts.

On appeal, the plaintiffs argue that both courts misconstrued their assertions as bystander claims; rather, they claim, they raised direct emotional distress claims, and, on that basis, the judgment underlying AC 37822 should be reversed.

## A

We begin our analysis by first considering whether Judge Lee properly ruled that the plaintiffs' complaint alleged bystander, as opposed to direct, negligent infliction of emotional distress claims. "The interpretation of pleadings is always a question of law for the court . . . . Our review of the trial court's interpretation of

the pleadings therefore is plenary." (Internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 559, 864 A.2d 1 (2005).

Connecticut law recognizes two types of negligent infliction of emotional distress actions. In one category, the conduct that causes the emotional distress is directed toward the plaintiff (direct emotional distress claims). See *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003). In the second, the conduct that causes the emotional distress is directed toward another (bystander emotional distress claims). See *Clohessy* v. *Bachelor*, supra, 237 Conn. 56. Despite their differences, and like all negligence claims, both subsets of negligent infliction of emotional distress claims require proof of the breach of a legally recognized duty, causing injury. *Lawrence* v. *O & G Industries, Inc.*, 319 Conn. 641, 649, 126 A.3d 569 (2015) ("[a] cause of action in negligence is comprised of four elements: duty; breach of that duty; causation; and actual injury" [internal quotation marks omitted]); see *Mirjavadi* v. *Vakilzadeh*, 310 Conn. 176, 191, 74 A.3d 1278 (2013) ("[i]f a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant" [internal quotation marks omitted]). The difference, then, between whether a set of pleadings sounds in either claim, turns on whether the duty breached was owed directly to the plaintiff (direct) or to a third party (bystander). See *Clohessy* v. *Bachelor*, supra, 237 Conn. 35–36. Our agreement with the trial court that the plaintiffs' pleadings sounded in bystander liability is based on the determination that the duty the plaintiffs alleged was breached was not a duty owed to them, but to Helen.

In their complaint that underlies AC 37822, the plaintiffs alleged the following regarding duty:

"30. On or about July 24, 2010, over the objection of Clarence Marsala and Gary Marsala, and without giving the plaintiff, Clarence Marsala, time to transport the decedent, the agents, apparent agents, employees, agent, and/or staff members of the defendant, Yale-New Haven Hospital, acting within their scope of their employment with the defendant and in furtherance of the defendant's business, permanently *removed the ventilator from the decedent, Helen Marsala, causing her to suffocate and die.*

"31. The defendant, Yale-New Haven Hospital, *had a duty to ascertain the wishes of the decedent, Helen Marsala,* from her next of kin, Clarence Marsala, prior to removing life support.

"32. The defendant, Yale-New Haven Hospital, *ignored the wishes of the decedent, Helen Marsala,* as expressed from her next of kin, Clarence Marsala, prior to removing life support.

"33. As a result of the defendant Yale-New Haven Hospital's conduct, through its agents, employees and/or staff members acting within the scope of their employment with the defendant, the plaintiff[s] . . . suffered the following serious, painful and permanent injuries: (a) severe emotional distress; (b) loss of opportunity to say goodbye; (c) depression; (d) loss of sleep; (e) stress; (f) anxiety; and (g) pain and suffering."[5] (Emphasis added.)

On the basis of these allegations, the plaintiffs argue that the Hospital owed them a direct duty to follow their wishes concerning the reintubation of Helen because the Hospital could have foreseen that acting contrary to the plaintiffs' wishes would cause the plaintiffs emotional distress. We disagree. A fair reading of these allegations leads us to the conclusion that the allegations of care, or lack of care by the Hospital, all concern its treatment of Helen. As noted, the plaintiffs alleged that the Hospital "removed the ventilator from the decedent, Helen Marsala, causing her to suffocate and die," "had a duty to ascertain the wishes of the decedent, Helen Marsala," and "ignored the wishes of the decedent, Helen Marsala, as expressed from her next of kin, Clarence Marsala, prior to removing life support." Only the alleged consequences are claimed to have impacted the plaintiffs.

Our analysis of duty does not, however, end with the pleadings. "Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Although it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable . . . . [T]he test for the existence of a legal duty entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Citation omitted; internal quotation marks omitted.) *Sic* v. *Nunan*, 307 Conn. 399, 406–408, 54 A.3d 553 (2012).

"The first part of the test invokes the question of

foreseeability, and the second part invokes the question of policy." (Internal quotation marks omitted.) *Gazo* v. *Stamford*, 255 Conn. 245, 250, 765 A.2d 505 (2001). Therefore, "[f]oreseeability alone is not enough to establish a legal duty. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world." (Internal quotation marks omitted.) *Di Teresi* v. *Stamford Health System, Inc.*, 142 Conn. App. 72, 80, 63 A.3d 1011 (2013).

Although the plaintiffs argue that the Hospital should have foreseen that its decision to not reintubate Helen would cause them emotional distress, foreseeability alone cannot establish a legally recognized duty. In this case, preexisting public policy determinations preclude us from recognizing that the Hospital owed such a legal duty to the plaintiffs. First, our legislature, by its silence, has tacitly rejected imposition of the legal duty the plaintiffs assert. See *Sic* v. *Nunan*, supra, 307 Conn. 410 (noting that legislature has primary responsibility for formulating public policy). General Statutes § 19a-571 (a) places a duty on any licensed medical facility, such as the Hospital, to consider only the patient's wishes when considering to remove a life support system of a terminal and permanently unconscious patient. And, when a patient's wishes are known to the patient's attending physician, the physician is required to "consider" those wishes; General Statutes § 19a-571 (a) (3); in the context of exercising the provider's "best medical judgment" about how to proceed regarding the patient's care. General Statutes § 19a-571 (a) (1). When a patient's wishes are unknown to the attending physician, § 19a-571 (a) (3) directs the physician to determine the patient's wishes by consulting other sources including the patient's family. In such a situation, however, any consultation with a patient's family members is undertaken to "determine the wishes of the patient." General Statutes § 19a-571 (a) (3). Thus, § 19a-571 (a) unambiguously removes any legal duty for the Hospital to follow the wishes of a patient's relatives.

Furthermore, the duty implications of § 19a-571 are illuminated by an examination of a prior version of that statute. See Public Acts 1991, No. 91-283, § 2 (P.A. 91-283). Prior to its amendment in 1991, the statute required the attending physician to obtain "the informed consent of the next of kin, if known, or legal guardian, if any, of the patient prior to removal" of the life support system. General Statutes (Rev. to 1989) § 19a-571 (3);[6] see also *McConnell* v. *Beverly Enterprises-Connecticut, Inc.*, 209 Conn. 692, 699 n.5, 553 A.2d 596 (1989). Apart

from the directive to obtain the informed consent of the patient's next of kin, the prior and current forms of § 19a-571 are substantially similar. We find it instructive that, in § 2 of P.A. 91-283, the legislature eliminated the requirement that a health care provider follow the wishes of anyone except the patient when determining appropriate end-of-life care. In doing so, the legislature highlighted the public policy that it is the patient to whom the health care provider owes a duty of reasonable care. The public policy implications of § 19a-571, viewed in context of its 1991 amendment, support our conclusion that the Hospital, as a patient care facility, did not owe a legally recognized duty to the plaintiffs regarding the treatment provided to Helen.

Our conclusions based on public policy are rooted in decisional law as well as a review of pertinent legislation. In addition to § 19a-571, relevant decisional law generally points to four factors "in determining the extent of a legal duty as a matter of public policy: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Murillo* v. *Seymour Ambulance Assn.*, *Inc.*, 264 Conn. 474, 480, 823 A.2d 1202 (2003). In the present case, however, further discussion of those factors is not required because our Supreme Court has already weighed them in the context of determining whether a health care provider owes a duty of care to someone other than its patient. Id., 478. In *Murillo* v. *Seymour Ambulance Assn.*, *Inc.*, the court "conclude[d] that, as a matter of public policy, [a health care provider] owed no duty to the plaintiff—a bystander who was not a patient of the [health care provider]—to prevent foreseeable injury to her as a result of her observing the medical procedures performed on her sister"; id.; and noted that a health care provider would be expected to focus its efforts on the patient in need of medical care and not on that patient's relative. Id., 480; see also *Jarmie* v. *Troncale*, 306 Conn. 578, 598–624, 50 A.2d 802 (2012); *Di Teresi* v. *Stamford Health System, Inc.*, supra, 142 Con. App. 81–86.

Accordingly, public policy considerations prohibit the recognition of the legal duty on which the plaintiffs' claim of direct injury is premised. The plaintiffs' negligent infliction of emotional distress claims, to have any viability, could only be characterized as sounding in bystander liability. See *Clohessy* v. *Bachelor*, 237 Conn. 35–36.

### B

We likewise conclude that Judge Tyma properly characterized the plaintiffs' intentional infliction of emotional distress counts as raising claims for bystander emotional distress. Our conclusion is guided by our

determination that the behaviors alleged by the plaintiffs; see footnote 5 of this opinion; related to the Hospital's care of Helen and only the consequences affected the plaintiffs. However, our analysis does not end here.

"In order for the plaintiff to prevail in a case for liability . . . [alleging intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 526–27, 43 A.3d 69 (2012). By contrast, to recover in a case for bystander emotional distress, a plaintiff must establish that he or she is closely related to the injured victim, had contemporaneous sensory perception of the injuring event or immediate observation of its consequences, that the injured party suffered substantial injury, and that the recovering party suffered serious emotional distress beyond that anticipated from a disinterested observer and which is itself not abnormal. *Clohessy* v. *Bachelor*, supra, 237 Conn. 56.

Reasoned jurisprudence instructs that when a defendant's extreme and outrageous conduct is directed toward a third party, but is specifically intended to or recklessly causes the plaintiff emotional distress, the plaintiff may, if other elements are also satisfied, have a claim for bystander (indirect) intentional infliction of emotional distress. See *Clohessy* v. *Bachelor*, supra, 237 Conn. 56. The Restatement (Third) of Torts states that "[w]hen an actor's extreme and outrageous conduct causes harm to a third person, as, for example, when a murderer kills a husband in the presence of his wife, the actor may know that the murder is substantially certain to cause severe emotional harm to the witnessing spouse. The murderer acts at least recklessly with regard to that risk." 2 Restatement (Third), Torts, Liability for Physical and Emotional Harm § 46, comment (m), p. 147 (2010). Additionally, mirroring the limitations placed on bystander claims for emotional distress in *Clohessy*, the Restatement (Third) further suggests that recovery for bystander emotional harm be limited to bystanders "who are close family members and who contemporaneously perceive the event." Id., comment (m), p. 148; see *Clohessy* v. *Bachelor*, supra, 237 Conn. 56.

Here, the plaintiffs argue that they raised direct intentional infliction of emotional distress claims because "[i]n total disregard of [Helen's] wishes and [their] directions, the [Hospital] unilaterally terminated [Helen's] life support and killed her." In making this claim, the plaintiffs have identified the Hospital's allegedly

extreme and outrageous conduct as the termination of Helen's life support against their direction. They argue that the Hospital's action toward Helen caused them emotional distress and, if the Hospital acted with the purpose of causing them emotional distress, they have a direct claim for intentional infliction of emotional distress as opposed to a bystander claim. This argument, however, is ill conceived. The plaintiffs' argument does not pivot on their status as bystanders or as the direct recipients of the defendant's alleged malfeasance. Rather, the plaintiffs focus on the concept of intentional behavior. See *Perez-Dickson* v. *Bridgeport*, supra, 304 Conn. 526 (first prong of intentional infliction of emotional distress requires plaintiff prove defendant intended to or recklessly inflicted emotional distress on plaintiff). The pleadings reflect, however, that the conduct that the plaintiffs characterize as extreme and outrageous was not directly inflicted upon them but upon Helen. Therefore, Judge Tyma properly determined that the plaintiffs' intentional infliction of emotional distress counts were premised on bystander liability.

### III

Having already concluded that both Judge Lee and Judge Tyma, in their decisions, properly characterized the plaintiffs' emotional distress claims as bystander claims; see part II of this opinion; we next consider whether Judge Lee properly granted the Hospital's motion to strike the negligent infliction of emotional distress claims.

"We begin by setting out the well established standard of review in an appeal from the granting of a motion to strike. Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on the [defendant's motion] is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. . . . It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Citations omitted; internal quotation marks omitted.) *Gazo* v. *Stamford*, supra, 255 Conn. 260.

As previously stated, "[b]ystander emotional distress is a derivative claim, pursuant to which a bystander who witnesses another person (the primary victim) suffer

injury or death as a result of the negligence of a third party seeks to recover form that third party for the emotional distress that the bystander suffers as a result." *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 564. "Courts historically have been reluctant to recognize this cause of action"; id.; in the context of medical malpractice, which "differs from the typical bystander scenario, such as an automobile accident, in which a lay witness is able to simultaneously assess that (1) something has gone terribly awry, and (2) the error is the cause of the resulting injuries to the primary victim." Id., 577. In fact, in *Maloney*, our Supreme court unequivocally "h[e]ld that a bystander to medical malpractice may not recover for emotional distress." *Maloney* v. *Conroy*, supra, 208 Conn. 393. Subsequently, however, our Supreme Court recognized a cause of action for bystander emotional distress; *Clohessy* v. *Bachelor*, supra, 237 Conn. 56; but substantially limited the circumstances under which bystander emotional distress claims could be brought in the medical malpractice context. *Squeo* v. *Norwalk Hospital Assn.*, supra, 560. In order to bring a claim for bystander emotional distress in the context of medical malpractice, a plaintiff must satisfy the following four conditions: "(1) he or she is closely related to the injury victim, such as the parent or the sibling of the victim"; *Clohessy* v. *Bachelor*, supra, 56; (2) "the severe emotional distress that he or she suffers as a direct result of contemporaneously observing gross professional negligence such that the bystander is aware, at the time, not only that the defendant's conduct is improper but also that it will likely result in the death of or serious injury to the primary victim"; *Squeo* v. *Norwalk Hospital Assn.*, supra, 580–81; (3) "the injury of the victim must be substantial, resulting in [the victim's] death or serious physical injury"; *Clohessy* v. *Bachelor*, supra, 56; and (4) the bystander's emotional injuries are severe and debilitating, such that they warrant a psychiatric diagnosis or otherwise substantially impair his or her ability to cope with life's daily routines and demands. *Squeo* v. *Norwalk Hospital Assn.*, supra, 591–92.

Judge Lee granted the Hospital's motion to strike the plaintiffs' bystander emotional distress claims on two separate grounds. First, he concluded that *Maloney* v. *Conroy*, supra, 208 Conn. 397, barred all claims of bystander claims of emotional distress premised on medical negligence. Additionally, Judge Lee determined that, independent of *Maloney*, the plaintiffs had not alleged that they "witnessed the actual removal of the respirator or the resulting demise of Helen or arrived shortly thereafter" and, as such, could not satisfy "the contemporaneous sensory perception of the event or conduct that causes the injury, or by [arrival] on the scene soon thereafter and before substantial change has occurred in the victim's condition or location," requirement for bystander claims under *Clohessy* v.

*Bachelor*, supra, 237 Conn. 56.

In *Squeo*, which was decided after the judgments in the present case, our Supreme Court held that *Clohessy* had superseded *Maloney*'s complete bar against bringing bystander emotional distress actions premised on medical malpractice. *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 570. In reaching this conclusion, however, the court in *Squeo* recognized only limited circumstances in which a plaintiff can plead a bystander emotional distress action premised on medical malpractice. Id., 560. One necessary predicate is that the plaintiff plead facts indicating that he or she "contemporaneously observ[ed] gross professional negligence such that [he or she] is aware, at the time, not only that the defendant's conduct is improper but also that it will likely result in the death of or serious injury to the primary victim." Id., 580–81. The court in *Squeo* refined, but did not eliminate, *Clohessy*'s requirement that the bystander have contemporaneous sensory perception of the event. In the present case, it was this requirement that the court concluded was absent from the complaint. We agree.

In their complaint, the plaintiffs allege that the Hospital breached its duty to Helen when it decided to change her status to "Do Not Reintubate" and permanently removed her ventilator. Nowhere, however, did the plaintiffs allege that they had contemporaneously observed this discrete act, knew of its likelihood to cause the primary victim serious bodily injury or death, or immediately recognized, without the aid of medical explanation, that the act constituted gross negligence. Id., 580–81 ("a bystander to medical malpractice may recover for the severe emotional distress that he or she suffers as a direct result of contemporaneously observing gross professional negligence such that the bystander is aware, at the time, not only that the defendant's conduct is improper but also that it will likely result in the death of or serious injury to the primary victim"); *Clohessy* v. *Bachelor*, supra, 237 Conn. 56 ("the emotional injury of the bystander is caused by the contemporaneous sensory perception of the event or conduct that causes the injury"); *Amodio* v. *Cunningham*, 182 Conn. 80, 91–92, 438 A.2d 6 (1980) ("[i]n addition to the requirement that the plaintiff bystander perceive the negligent act, it appears that recovery for emotional distress resulting from injury inflicted upon another is also restricted to situations where the injury to the third party is manifest contemporaneously with the negligent act").

Judge Lee, in striking the plaintiffs' counts, correctly noted that "the plaintiffs nowhere allege that they witnessed the actual removal of the respirator or the resulting demise of [Helen] or arrived shortly thereafter." Specifically, the plaintiffs do not allege in their complaint that any of them were present at the commit-

tee meeting when the Hospital made the decision to permanently remove Helen's ventilator. Also, they do not allege that any of the plaintiffs were at the Hospital when the Helen's ventilator was ultimately removed and she died. In sum, the plaintiffs do not allege in their complaint that any of them witnessed the Hospital's alleged misconduct. Accordingly, Judge Lee properly concluded that the plaintiffs had not stated a claim for bystander emotional distress under *Clohessy*. As a result, the court properly granted the Hospital's motion to strike the plaintiffs' bystander negligent infliction of emotional distress claims.[7]

## IV

Because we have already concluded that the plaintiffs' allegations sound in bystander emotional distress; see part II of this opinion; we next determine whether Judge Tyma correctly granted the Hospital's motion for summary judgment on the counts alleging intentional infliction of emotional distress.[8]

We review a court's grant of summary judgment de novo. *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 592 n.19. It is well established that "[s]ummary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact *together with the evidence disclosing the existence of such an issue.* . . . It is not enough . . . for the opposing party merely to assert the existence of such a disputed issue. . . . Mere assertions of fact, whether contained in a complaint or in a brief, are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]. . . .

"As a general rule, then, [w]hen a motion for summary judgment is filed and supported by affidavits and other documents, an adverse party, by affidavit or as otherwise provided by . . . [the rules of practice], must set forth specific facts showing that there is a genuine issue for trial, and if he does not so respond, summary judgment shall be entered against him. . . . Requiring the nonmovant to produce such evidence does not shift the burden of proof. Rather, it ensures that the nonmovant has not raised a specious issue for the sole purpose of forcing the case to trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 593–94.

As noted, in order to prove a claim for bystander emotional distress in the medical malpractice context, a plaintiff must allege a close kinship with the victim, that he or she suffered extreme emotional distress directly resulting from contemporaneous observance of the alleged gross malfeasance, that the victim's injuries were serious and that the plaintiff's emotional injuries are severe and debilitating. *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 580–81.

In the case at hand, the plaintiffs did not allege, nor did they produce evidence that they contemporaneously saw the conduct they claim was extreme and outrageous, namely, the permanent removal of Helen's ventilator. See id. To the contrary, relevant deposition testimony established that the plaintiffs could not possibly have witnessed the allegedly extreme and outrageous conduct of the Hospital because none of the plaintiffs was present when the ventilator was permanently removed from Helen. Gary, after learning that the Hospital was considering removing Helen's ventilator, left the Hospital before the ventilator was removed and does not remember whether he saw Helen again. Tracey never visited Helen in the Hospital. And Michael, Kevin, and Randy only learned about the removal of the ventilator after it was removed, during a phone call, and were not present at the Hospital at the relevant time. In response to this evidence produced by the Hospital in support of its summary judgment motion, the plaintiffs have not adduced any contrary evidence to establish the existence of a dispute of material fact on this issue. Faced with the Hospital's proffer, it was the plaintiffs' burden to adduce such evidence as a means of demonstrating the existence of a genuine issue of material fact. See *Fernandez* v. *Standard Fire Ins. Co.*, 44 Conn. App. 220, 222, 688 A.2d 349 (1997) ("party opposing [summary judgment] must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact" [internal quotation marks omitted]). Therefore, there is no dispute of material fact that the plaintiffs did not contemporaneously observe the Hospital's alleged extreme and outrageous conduct. As a result, the plaintiffs cannot prevail on their counts of bystander intentional infliction of emotional distress. Judge Tyma properly rendered summary judgment in favor of the Hospital on those counts.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] Although all of the plaintiffs purported to appeal from the decisions of Judge Lee and Judge Tyma, on June 10, 2015, this court dismissed the appeal in AC 37822 as to Clarence in both his individual and representative capacities because he still has claims pending in the trial court. Accordingly, for the purpose of clarity in this opinion, we hereinafter refer to Helen's five children collectively as the plaintiffs and to Clarence as such.

[2] Neither Clarence nor the plaintiffs was present when the Hospital decided to change Helen's status to "Do Not Reintubate" or when Helen subsequently died. However, prior to the Hospital's ultimate decision, a member of the Hospital staff did call Gary and informed him that the Hospital was consider-

ing entering a "Do Not Reintubate" order for Helen. Gary, in turn, relayed the Hospital's decision to Clarence, who had expressed to the Hospital that he was Helen's next of kin and that his children were not to be involved in making medical decisions on Helen's behalf. Clarence and Gary then went to the Hospital and objected to the fact that the Hospital had changed Helen's status to "Do Not Reintubate." At the time Clarence and Gary objected to Helen's change in status, Helen was still intubated. Her ventilator was not removed until after Clarence and Gary left the Hospital and she passed away later that night.

[3] In addition, the operative complaint alleged: violations of Connecticut Unfair Trade Practices Act (CUTPA) (counts thirteen through nineteen), a violation of § 19a-571 (count twenty), assault (count twenty-three), battery (count twenty-four), and a violation of the right to privacy (count twenty-five). On October 30, 2013, the court, *Lee*, *J.*, granted the Hospital's motion to strike these counts and the plaintiffs did not file a substitute pleading within the fifteen days as authorized by Practice Book § 10-44, nor did they appeal from the entry of judgment on those counts.

[4] The court, *Tyma*, *J.*, also granted the Hospital's motion for summary judgment in the action filed by Clarence, as the administrator of Helen's estate, alleging medical malpractice. The court reasoned that the medical malpractice claim was duplicative of the wrongful death counts pursued in the action underlying AC 37822 and, therefore, was legally insufficient. See *Floyd* v. *Fruit Industries*, *Inc.*, supra, 144 Conn. 669. That decision was the basis for Clarence's appeal in AC 37821. For reasons stated previously in this opinion, we decline to review any claim related to that decision.

[5] The plaintiffs repeated these allegations in counts two through six of their complaint, which alleged negligent infliction of emotional distress as to each individual plaintiff respectively. The plaintiffs also claimed intentional infliction of emotional distress (counts eight through twelve), premised on the same factual allegations, but alleging further that the Hospital's actions were intentional and extreme and outrageous. Specifically, in those counts, the plaintiffs alleged that:

"31. The defendant, Yale-New Haven Hospital, through its agents, apparent agents, employees, and/or staff members, intended to inflict emotional distress on the plaintiff[s] . . . or knew or should have known that emotional distress was the likely result of their conduct.

"32. The defendant's conduct of encouraging its agents, employees and/or staff members to remove the ventilator from [Helen] despite the family's objections when it knew or should have known that without the ventilator [Helen] would pass away constitutes extreme and outrageous conduct."

[6] General Statutes (Rev. 1989) § 19a-571 was entitled "Liability re removal of life support system of incompetent patient. Attending physician must obtain consent of next of kin consideration of wishes of patient. Document as expression of wishes." and provided: "Any physician licensed under chapter 370 or any licensed medical facility which removes or causes the removal of a life support system of an incompetent patient shall not be liable for damages in any civil action or subject to prosecution in any criminal proceeding for such removal, provided (1) the decision to remove such life support system is based on the best medical judgment of the attending physician; (2) the attending physician deems the patient to be in a terminal condition; (3) the attending physician has obtained the informed consent of the next of kin, if known, or legal guardian, if any, of the patient prior to removal; and (4) the attending physician has considered the patient's wishes as expressed by the patient directly, through his next of kin or legal guardian, or in the form of a document executed in accordance with section 19a-575, if any such document is presented to, or in the possession of, the attending physician at the time the decision to terminate a life support system is made. If the attending physician does not deem the patient to be in a terminal condition, beneficial medical treatment and nutrition and hydration must be provided." See *McConnell* v. *Beverly Enterprises-Connecticut*, *Inc.*, supra, 209 Conn. 699 n.5.

[7] We further note that the plaintiffs argued to the trial court that they had pleaded a direct claim of negligent infliction of emotional distress and that their claim was not premised on bystander liability. On appeal, the plaintiffs argue that because *Squeo* subsequently changed the landscape of bystander claims for emotional distress in the medical malpractice context, they should not be precluded from defending their pleadings on a basis that they already disavowed. Whether the effect of *Squeo* allows the plaintiffs to change tack on appeal without amending their pleadings is a question we need not reach because the plaintiffs, for all their reliance on *Squeo*, have not pleaded facts

tending to establish the requirements mandated by *Squeo*, specifically that they witnessed gross negligence on the part of the Hospital; *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 580–81; and that they "suffer[ed] injuries that are severe and debilitating, such that they warrant a psychiatric diagnosis or otherwise substantially impair the bystander's ability to cope with life's daily routines and demands." Id., 591–92. We further note that pleading requirements similar to those adopted in *Squeo* preexisted the filing of the plaintiffs' complaint. See *Clohessy* v. *Bachelor*, supra, 237 Conn. 56.

[8] Although Judge Tyma granted the Hospital's motion pursuant to the now abandoned holding of *Maloney*, our review of a court's granting of a motion for summary judgment is plenary; *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 592 n.19; and we may affirm the judgment on any grounds supported in the record. See *Gerardi* v. *Bridgeport*, 294 Conn. 461, 466–67, 985 A.2d 328 (2010). In the present case, the alternative ground upon which we affirm the court's judgment was briefed and argued before both the trial court and this court. See *White* v. *Mazda Motor of American, Inc.*, 313 Conn. 610, 619–21, 99 A.3d 1079 (2014).

--------------------