******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CADCO, LTD. *v.* DOCTOR'S ASSOCIATES, INC., ET AL.
## (AC 40306)

Sheldon, Elgo and Flynn, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendants for, inter alia, unfair and deceptive acts and practices in their business dealings concerning the design and development of a certain new product in violation of the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.). Beginning in February, 2012, and over the course of approximately one and one-half years, the plaintiff engaged in a business relationship with the defendants to design and produce a metal heating plate for the defendants' production of a certain new food product in certain of its restaurants. In August or September, 2013, following the dissemination of information about the heating plate to the defendants and orders of the heating plate for testing by the defendants, the plaintiff filed an application for a design patent for the heating plate, which was granted following the initiation of this action. In October, 2013, the plaintiff was informed that the defendants had decided to go with another provider for the heating plate, and, subsequently, the plaintiff discovered that another company, with personal ties to the defendants, had supplied a nearly identical heating plate to the defendants. The trial court granted the defendants' motions for summary judgment on all counts and rendered judgment thereon, from which the plaintiff appealed to this court. *Held*:

1. The trial court properly concluded that there was no genuine issue of material fact that the defendants' conduct did not amount to an unfair act or practice in violation of CUTPA; the plaintiff's claims failed to meet any prong of the cigarette rule, which is used to determine whether a practice violates CUTPA, as the defendants' prolonged negotiations with the plaintiff and the defendant's conduct in giving the plaintiff's design to a competitor in the absence of a patent or confidentiality agreement, and granting a contract to a manufacturer with ties to the defendants, which the defendants were free to do, did not offend public policy in such a way as to violate an established concept of unfairness, the defendants' behavior in not hiring the plaintiff to produce the new heating plates it had designed or in taking the plaintiff's design to a competitor with ties to the defendant companies was not immoral, unethical, oppressive, or unscrupulous in any way, and any injury that the plaintiff suffered could reasonably have been avoided by obtaining a confidentiality agreement or other stopgap measure to protect its product design until the patent it had applied for was issued.

2. The trial court properly concluded that there was no genuine issue of material fact as to whether the defendants' conduct constituted a deceptive act or practice under CUTPA; there was no evidence of any misrepresentation, omission, or practice by the defendants likely to mislead the plaintiff to believe that it would receive a contract from the defendants, and to the extent the plaintiff claimed that the defendants should have informed it explicitly that they were soliciting bids from others and that one potential bidder had been given the plaintiff's design upon which to formulate its own bid, such omissions did not amount to a CUTPA violation because the defendants were under no duty to so inform the plaintiff.

3. The trial court did not err in concluding that there was no genuine issue of material fact as to whether the defendants were unjustly enriched to the plaintiff's detriment by the defendants' alleged conduct; although the defendants benefited from the time and effort it took the plaintiff to design the heating plate, there was no evidence that they did not compensate the plaintiff fully for that benefit, as there was evidence that the defendants paid the plaintiff each time they purchased one or more heating plates for product and market testing.

Argued November 14, 2018—officially released March 5, 2019

Action to recover damages for, inter alia, unfair trade practices, and for other relief, brought to the Superior Court in the judicial district of Litchfield, where the court, *Pickard, J.*, granted the plaintiff's motion to cite in additional parties; thereafter, the matter was transferred to the judicial district of Hartford, Complex Litigation Docket; subsequently, the court, *Moukawsher, J.*, granted the defendants' motions for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed.*

*Patrick E. Power*, for the appellant (plaintiff).

*Jeffrey R. Babbin*, with whom were *David R. Roth* and, on the brief, *John M. Doroghazi*, for the appellees (named defendant et al.).

*Matthew W. Buttrick*, pro hac vice, with whom was *David T. Martin*, for the appellee (defendant Independent Purchasing Cooperative, Inc.).

*Opinion*

SHELDON, J. The plaintiff, Cadco, Ltd., commenced this action alleging that the defendants, Doctor's Associates, Inc. (Doctor's Associates), Franchise World Headquarters, LLC (Franchise), and Independent Purchasing Cooperative, Inc. (Independent), engaged in unfair acts or practices and unfair methods of competition and deceptive acts or practices in their business dealings with the plaintiff concerning the design and development of a new product in violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and that in so doing they unjustly enriched themselves to the plaintiff's detriment. The plaintiff appeals from the summary judgment rendered in favor of the defendants on its complaint. We conclude that the trial court properly determined that the defendants were entitled to summary judgment on each of the plaintiff's claims against them because they established that there was no genuine issue of material fact that the plaintiff had no right to prevail on any of those claims. Accordingly, we affirm the judgment of the trial court.

The following facts are undisputed. In February, 2012, representatives from Doctor's Associates, the franchisor of the Subway restaurant chain in the United States, and Franchise, a corporation that provides administrative services to Doctor's Associates, approached the plaintiff about purchasing a standard flat metal heating plate that the plaintiff manufactured. The plate was to be considered for use in Subway restaurants to cook a new flatbread pizza product called the "Flatizza." As a result of this meeting, the plaintiff provided one of its standard heating plates to Doctor's Associates for testing at Subway headquarters. Doctor's Associates also requested that the plaintiff sign a nondisclosure agreement to protect various details about its business practices, which the plaintiff signed on February 27, 2012.

During the course of testing, representatives from Franchise notified the plaintiff that problems had arisen with using the plaintiff's standard plate to cook the Flatizzas. Thereafter, between April, 2012, and September, 2012, the plaintiff made numerous changes to its standard heating plate to address those problems, creating six different versions of the plate for the defendants to test. In its correspondence with defendants Doctor's Associates and Franchise concerning the changes that had been made to the plates, the plaintiff shared detailed technical information about its design. By the end of the testing period, Doctor's Associates had purchased a total of 133 heating plates from the plaintiff. Subway's primary oven manufacturer, TurboChef, ultimately approved the fifth version of the modified heating plate for use in its ovens in Subway restaurants. Subway then began to test market the Flatizza in several

cities across the country to determine if it should offer the new product nationally. To facilitate such market testing, Doctor's Associates purchased 1,728 of the modified heating plates from the plaintiff, in eight separate orders from May, 2012 through February, 2013.

On June 4, 2012, a meeting was held between several the plaintiff representatives and representatives from Doctor's Associates and Franchise. At that meeting, the plaintiff was informed that if Subway's management decided to offer the Flatizza throughout the country, it would aim to distribute the modified heating plates to its franchisees in March, 2013, and thus the plaintiff would be expected to begin production of the new plates in October, 2012, after the plaintiff and Independent, Subway's purchasing arm, determined the pricing for the "full production rollout." The plaintiff e-mailed representatives of Doctor's Associates and Franchise on June 7, 2012, to memorialize the June 4 meeting, but received no response. The defendants later decided to delay the March, 2013 rollout of the Flatizza.

From March, 2013 through September, 2013, the defendants continued to update the plaintiff regarding the Flatizza project and to gather information from the plaintiff regarding its production capabilities for the new plates, the process by which it would seek national public health and safety approval for them, and its updates to its proposal for pricing the plates' production. On March 25, 2013, Ed Degnan, an equipment specialist for Franchise, requested a detailed production timeline and cost information from the plaintiff for an order of 16,000 plates, but he cautioned in an e-mail the following day: "To be clear, this is exploratory only [and] not an order. DO NOT ORDER ANY MATERIALS." In April, 2013, Franchise informed the plaintiff, in another e-mail, that it was working with four different vendors on the project. On May 31, 2013, Tricia Hetherington, the director of new product development for Franchise, e-mailed the plaintiff, stating that she would "like to explore how we could be ready for a potential February, 2014 launch of Flatizza."

On July 10, 2013, the plaintiff e-mailed a representative from Independent to confirm the details of a recent phone call between itself and Independent concerning the need for a production timeline and pricing for 22,000 of the new plates, Subway's intent to roll out the Flatizza in its restaurants in February, 2014, and, to that end, its need to have all of the new plates delivered to a warehouse in Massachusetts for that purpose by December 20, 2013, and for the plaintiff to commit to filling the order no later than September 1, 2013. In response to that e-mail, the Independent representative stated that, although the plaintiff's summary of the phone call was accurate, "[m]uch on our end is not firm, so please await further information . . . ."

At the same time, there was uncertainty as to whether

Merrychef, the manufacturer of a different oven used in certain Subway restaurants as an alternative to the TurboChef oven, would make its own heating plates for use in its ovens to cook Flatizzas rather than using plates manufactured by the plaintiff. Thereafter, on July 10, 2013, Independent asked the plaintiff to inform it of "the impact of an additional 7000 Merrychef style plates should we add these to the order." On July 18, 2013, Franchise sent an e-mail to the plaintiff with the subject line "Pizza Plate Bid Information." That e-mail read: "Do you guys have any questions on this bid? I have notified my Merrychef rep that if you guys are approved to manufacture both plates then Merrychef will need to approve your plate in their oven. I would then send one of the [two] Merrychef plates you sent me to Merrychef for approvals." This was the first and only documented mention to the plaintiff by any defendant that the choice of manufacturer for the new heating plates, if they were ordered, would be made through a bidding process. Later that evening, Franchise e-mailed the plaintiff that it "looks like you are ready to [go] if we give you the go ahead."

On August 1, 2013, Independent e-mailed the plaintiff to verify the production timeline information for a presentation by Franchise and Independent to "the leadership," so that the leadership could "understand the timing of the decision required." On August 16, 2013, the plaintiff e-mailed Independent to confirm a quote for the heating plates of $67.27 per unit. On September 13, 2013, Degnan informed the plaintiff that there were no new updates on the Flatizza project and that he would not expect any decisions that year. The final e-mail exchange between Franchise and the plaintiff occurred on September 23, 2013, when the plaintiff asked Franchise to "go over a few things" over the telephone and Franchise responded that it was not sure what the plaintiff wanted to discuss, but it still needed the information about production capabilities and other matters it had requested from the plaintiff earlier that day.

On October 10, 2013, Sam Grano de Oro, the director of operations for the plaintiff, received a telephone call from Degnan. Degnan first asked whether the plaintiff had purchased the materials needed to fulfill an order from the defendants for the full production rollout. Grano de Oro responded that the plaintiff had not purchased any materials, but that all of the necessary preparations to do so had been made with its materials suppliers. Degnan then informed Grano de Oro that the defendants had "decided to go with another provider," without offering any explanation for its decision. Grano de Oro responded by requesting an opportunity to address any concerns that the defendants might have had with their bid, but that request was not honored. All he could do at that time was to inform Degnan that the new heating plate and its design belonged to the

plaintiff. Sometime in late August or early September, 2013, the plaintiff filed an application for a design patent for the modified heating plate. That application was ultimately granted approximately two years later, on September 15, 2015.

Early in 2014, the plaintiff became aware that Subway had proceeded with the nationwide rollout of the Flatizza. In April, 2014, representatives from the plaintiff began to investigate how that had been done and discovered that a metal heating plate similar to the one the plaintiff had designed for the defendants was being used in Subway restaurants in Florida and Connecticut. The plaintiff then hired a mechanical engineer and a material science engineer to compare the new heating plate it had designed to the plate being used in Subway restaurants. The engineers opined that the two plates were nearly identical and that the defendants' plate appeared to be a refinement of the plaintiff's plate. Through its continued investigation, the plaintiff discovered that an executive at VTM Concepts, the supplier of the nearly identical heating plate being used in Subway restaurants, is married to the president of Doctor's Associates and Franchise, who had been copied on several of the e-mails between the plaintiff and Franchise regarding the progress of the heating plate project.

The plaintiff subsequently filed this action. In its five-count amended complaint, the plaintiff alleged that the defendants were jointly and severally liable on the following theories of liability: (1) in the first count, for unfair acts or practices and unfair methods of competition in violation of CUTPA; (2) in the second count, for punitive damages under CUTPA, based upon the unfair acts or practices and unfair methods of competition alleged in the first count; (3) in the third count, for deceptive acts or practices in violation of CUTPA; (4) in the fourth count, for punitive damages under CUTPA based upon the deceptive acts or practices alleged in the third count; and (5) in the fifth count, unjust enrichment based upon the conduct alleged in the first four counts. The complaint alleged, more specifically, that over the course of one and one half years, the defendants had expressly or impliedly represented to the plaintiff, and thereby caused it to believe, that it would receive an order for over 25,000 new heating plates if Subway decided to launch the Flatizza nationwide. In reliance on these representations, the plaintiff had designed a custom heating plate for the defendants, supplied samples of the new plate to Subway for test marketing purposes, and turned over to the defendants the design and technical information needed to manufacture the plates. Each of the defendants answered the complaint by denying all allegations of wrongdoing against it and pleading several special defenses.

On January 13, 2017, the defendants filed parallel motions for summary judgment. In its memorandum of

decision granting the motions for summary judgment as to all defendants on all counts, the trial court concluded that the undisputed facts showed that there was nothing unfair or deceptive about the defendants' dealings with the plaintiff with respect to the new heating plates, noting that "not every missed business opportunity violates CUTPA," and that the plaintiff could have avoided any injury to itself resulting from others' use of its product design by taking reasonable steps to protect itself. The court further concluded that the defendants had not been unjustly enriched by the plaintiff's efforts to design the new heating plate because the plaintiff had not been deceived or misled to provide its design to the defendants without paying for it or without protecting itself by negotiating a confidentiality agreement.

On appeal, the plaintiff claims that (1) the trial court improperly concluded that no genuine issue of material fact exists as to whether the defendants' conduct constituted an unfair act or practice in violation of CUTPA, (2) the court improperly concluded that there was no genuine issue of material fact as to whether the defendants' conduct constituted a deceptive act or practice in violation of CUTPA, and (3) the court erred in concluding that no genuine issue of material fact exists as to whether the defendants were unjustly enriched to the plaintiff's detriment.

"Our review of the trial court's decision to grant a motion for summary judgment is plenary." (Internal quotation marks omitted.) *Brusby* v. *Metropolitan District*, 160 Conn. App. 638, 646, 127 A.3d 257 (2015). Practice Book § 17-49 provides in relevant part: "[Summary] judgment . . . shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . It is not enough . . . for the opposing party merely to assert the existence of such a disputed issue. . . . Mere assertions of fact, whether contained in a complaint or in a brief, are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Emphasis omitted; internal quotation marks omitted.) *Marsala* v. *Yale-New Haven Hospital, Inc.*, 166 Conn. App. 432, 458–59, 142 A.3d 316 (2016). "A material fact is a fact that will make a difference in the result of a case." (Internal quotation marks omitted.) *Silberstein* v. *54 Hillcrest Park Associ-*

*ates, LLC*, 135 Conn. App. 262, 266, 41 A.3d 1147 (2012).

## I

The plaintiff first claims that the trial court improperly concluded that no genuine issue of material fact exists as to whether the defendants' conduct constituted an unfair act or practice under CUTPA. Specifically, the plaintiff argues that the defendants induced the plaintiff to believe that it would receive a large order for new plates of the type it had designed and developed for the defendants if the Flatizza was introduced in Subway restaurants nationwide, but instead gave their design to a manufacturer run by the spouse of a high ranking executive of Doctor's Associates and Franchise, from which they purchased the new plates at a slightly lower price than that quoted to them by the plaintiff. Although the conduct complained of by the plaintiff might very well constitute a CUTPA violation if the circumstances were as alleged, that claim is factually unsupported in this case. Cf. *Milford Paintball, LLC* v. *Wampus Milford Associates, LLC*, 156 Conn. App. 750, 765–66, 115 A.3d 1107, cert. denied, 317 Conn. 912, 116 A.3d 812 (2015) (persistent negligent misrepresentations intended to induce execution of subject lease by plaintiff supported finding of unfairness under CUTPA); *Utzler* v. *Braca*, 115 Conn. App. 261, 281, 972 A.2d 743 (2009) (builder's material intentional misrepresentation that induced plaintiff to invest in project was an unfair or deceptive practice that violated CUTPA). There is no factual basis for the plaintiff's claim that it was unfairly induced to act to its own detriment in any way. To the contrary, the evidentiary materials submitted to the trial court show that the plaintiff freely sold the defendants a product and the design specifications therefor that were unprotected, and thus fully available to the defendants to use, refine or copy as they saw fit. Therefore, we agree with the court's determination that there is no genuine issue of material fact that the defendants' conduct did not amount to an unfair act or practice in violation of CUTPA, and thus that the defendants were entitled to judgment on the plaintiff's first two claims as a matter of law.

General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "It is well settled that in determining whether a practice violates CUTPA [our Supreme Court has] adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is

immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 409, 78 A.3d 76 (2013).

A

The first prong of the cigarette rule requires us to consider whether the alleged unfair practice offends public policy to the extent that it constitutes a breach of an established concept of unfairness. The plaintiff argues that such a breach can be found in (1) the defendants' inducement of the plaintiff to believe that it would receive a contract for a large order of the new plates, which allowed the defendants to obtain technical information for the plate's product design, (2) giving the plaintiff's design for the new plate to a competitor that had personal ties to the defendants, and (3) then awarding the manufacturing contract for the new plates to that competitor instead of to the plaintiff. The plaintiff does not explicitly state which public policies support its claims, arguing general unfairness instead. It appears that the public policy basis for the plaintiff's first argument is equitable estoppel.

"Strong public policies have long formed the basis of the doctrine of equitable estoppel. The office of an equitable estoppel is to show what equity and good conscience require, under the particular circumstances of the case, irrespective of what might otherwise be the legal rights of the parties. . . . No one is ever estopped from asserting what would otherwise be his right, unless to allow its assertion would enable him to do a wrong. . . . There are two essential elements to an estoppel: the party [against whom it is asserted] must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do something to his injury which he otherwise would not have done. Estoppel rests on the misleading conduct of one party to the prejudice of the other. In the absence of prejudice, estoppel does not exist." (Internal quotation marks omitted.) *Fischer* v. *Zollino*, 303 Conn. 661, 668, 35 A.3d 270 (2012).

We agree with the trial court that the defendants' prolonged negotiations with the plaintiff do not offend public policy in such a way as to violate an established concept of unfairness within the meaning of the first prong of the cigarette rule. In rejecting the plaintiff's CUTPA claim, the trial court concluded that there was no genuine issue of material fact that the defendants' communications with the plaintiff about the design or

development of the new plate was misleading or intended to induce the plaintiff to believe that it would receive the contract. Although the defendants spent one and one half years discussing the plaintiff's potential receipt of a contract for a large order of the new plates, the plaintiff concedes that there never was such a contract and that throughout its dealings with the defendants it fully understood that Subway might decide to forego a national rollout of the Flatizza, in which case no order for the new plates it designed and developed would ever be placed with anyone. Even if the defendants had explicitly stated that they intended to purchase plates from the plaintiff in the event of a nationwide rollout of the Flatizza, it is undisputed that any order was conditioned on the rollout's occurrence. Moreover, the defendants cautioned the plaintiff on more than one occasion that it should not take any actions in reliance on their exploratory conversations. As noted by the trial court, the plaintiff hoped that it would be chosen to manufacture a large order of plates for the defendants and, from the e-mails discussing production timelines, shipping details, and pricing, it seemed for some time that that would happen; however, the defendants never made any statements that would lead the plaintiff reasonably to believe that a future contract was guaranteed. Without any misleading statements or conduct on the part of the defendants, the public policy underlying equitable estoppel was not violated by their conduct in violation of the first prong of the cigarette rule.

The plaintiff further contends that the defendants violated CUTPA by giving the plaintiff's design to a competitor. Here again, the plaintiff does not point this court to any particular public policy which it claims to have been violated by such conduct, thus establishing its unfairness under the first prong of the cigarette rule. In support of its argument, however, the plaintiff states that during its dealings with the defendants it was seeking a patent for the modified heating plate and had informed the defendants of these efforts. Therefore, we consider whether the defendants' actions violated any established public policy related to the plaintiff's efforts to patent the new heating plate.

As an initial matter, it is undisputed that there was no patent or confidentiality agreement in effect for the plaintiff's design at the time of its dealings with the defendants. The most protection the product had was the pending patent application that was not submitted until August or September, 2013. It is disputed between the parties as to whether the plaintiff ever informed the defendants that it had filed a patent application for the heating plate. The defendants deny being told by the plaintiff that it had filed such an application. The plaintiff claims that in September, 2012, representatives from the plaintiff had met with representatives from Doctor's Associates and Franchise at Subway headquar-

ters to give them a status report on the heating plate project and during that meeting it had noted that it was in the process of applying for a design patent for the new plate. The plaintiff also etched the words "Patent Pending" on at least forty of the heating plates that it sold to the defendants during the testing process. However, these disputed facts are not material because, even if we assume that the plaintiff informed the defendants of its pending patent application in September, 2012, and that the defendants, knowing this information, took the plaintiff's plate design to a competitor, these acts would not have violated any established public policy.

"To willfully infringe a patent, the patent must exist and one must have knowledge of it. . . . Filing an application is no guarantee any patent will issue and a very substantial percentage of applications never result in patents." (Emphasis omitted; internal quotation marks omitted.) *State Industries, Inc.* v. *A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985). There is a "strong federal policy favoring the full and free use of ideas in the public domain." *Lear, Inc.* v. *Adkins*, 395 U.S. 653, 674, 89 S. Ct. 1902, 23 L. Ed. 2d. 610 (1969). "[P]atent laws have embodied a careful balance between the need to promote innovation and the recognition that imitation and refinement through imitation are both necessary to invention itself and the very lifeblood of a competitive economy." *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U.S. 141, 146, 109 S. Ct. 971, 103 L. Ed. 2d 118 (1989).

By informing the defendants that they were in the process of applying for a patent and marking their product "Patent Pending," the plaintiff merely gave notice that the plate might be subject to future protection. The plaintiff argues that the trial court erred in its analysis of the defendants' conduct under the first and second prongs of the cigarette rule by requiring the plaintiff to have taken reasonable measures to avoid the injury, which is only required under prong three of the rule. We disagree with the plaintiff's interpretation of the trial court's decision and conclude that the steps taken to protect the heating plates, as referenced by the trial court, are relevant to determine whether the defendants' actions were unfair under the circumstances. Here, Doctor's Associates made several arm's length purchases of these unprotected products from the plaintiff over the course of a year and a half. The defendants were free to do as they wished with the plaintiff's products that they purchased in that time frame, including showing those products, which they then owned without restriction, to other companies and asking those companies to refine the products' design. The public policy underlying our patent law supports such imitation and refinement. Thus, it cannot be said that the defendants' conduct in so doing violated any established concept of unfairness.

Finally, the plaintiff argues that the defendants' committed an unfair act or practice by causing it to engage in a "sham 'bidding' process," in the course of which it was forced to bid against only one competitor with personal ties to the defendant companies that had been given the plaintiff's design with which to prepare and submit its competing bid. Nothing about the fact that the defendants gave the contract to a manufacturer run by the spouse of the president of Doctor's Associates and Franchise offends public policy. It is well established that a trader or manufacturer carrying on an entirely private business is free to determine with whom it will deal. See *United States* v. *Freight Assn.*, 166 U.S. 290, 320–21, 17 S. Ct. 540, 41 L. 3d. 1007 (1897). Further, there is nothing about the fact that there were only two companies bidding for the contract that is inherently unfair.

In reaching our conclusion, we are mindful that in *Landmark Investment Group, LLC* v. *CALCO Construction & Development Co.*, 318 Conn. 847, 882, 124 A.3d 847 (2015), our Supreme Court concluded that the "trial court acted improperly when, rather than considering what inferences could have been drawn by the jury from the totality of the defendants' conduct, it parsed [the plaintiff's] allegations and concluded that each of the defendants' acts did not meet the standard necessary to prove a violation of CUTPA." An individual examination of each of the defendants' discrete acts is necessary to analyze the public policy implications of the totality of the conduct. When considering the totality of the defendants' conduct—of negotiating with the plaintiff over a substantial period of time without making any misrepresentations, giving another manufacturer the plaintiff's unprotected design to reverse engineer and refine, and granting a contract to a manufacturer with ties to the defendant companies, which it was free to do—such conduct does not amount to a violation under CUTPA. Therefore, we conclude that the defendants' actions do not violate the first prong of the cigarette rule.

B

Under the second prong of the cigarette rule, we must consider whether the defendants' actions were "immoral, unethical, oppressive or unscrupulous." (Internal quotation marks omitted.) *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 357, 805 A.2d 735, cert. denied, 262 Conn. 922, 812 A.2d 864 (2002). Whether conduct so qualifies is not controlled by "a global standard but rather must reflect the particular circumstances of the case." Id. "A trade practice that is undertaken to maximize the defendant's profit at the expense of the plaintiff's rights comes under the second prong of the cigarette rule." *Votto* v. *American Car Rental Inc.*, 273 Conn. 478, 485, 871 A.2d 981 (2005).

In *Johnson Electric Co.*, the defendant general contractor submitted a bid for a contract on a construction project in which it named the plaintiff as the subcontractor it would use to complete the project if the bid were awarded, but hired a different subcontractor after the bid was awarded when the plaintiff refused its request to reduce its quoted price. *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, supra, 72 Conn. App. 346. An attorney trial referee found that it was industry practice that a subcontractor named in a successful bid would receive a subcontract for the work it had quoted when the contract was awarded on the basis of that quote. Id. The trial court, rejecting the report of the attorney trial referee, found that the plaintiff had not proven its CUTPA claim. Id., 344. In reversing the trial court, this court found that the defendant's conduct met the second prong of the cigarette rule because it deliberately refused to conform its conduct to the established industry practice for the admitted purpose of maximizing its profit, and thereby caused substantial injury to the plaintiff. Id., 357.

In *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 873 A. 2d 929 (2005), by contrast, the plaintiffs argued that the defendant had violated the second prong of the cigarette rule by inducing them to believe that the defendant would either provide financing for a deferred billing program or close on the proposed acquisition of the plaintiff's company. See id., 48. It was undisputed that there was no enforceable agreement between the parties for either the financing or the acquisition. See id., 85. The plaintiff's theory at trial was that the defendant initially intended to provide financing to the plaintiff but then changed its mind when the cost estimates changed for the program. Id., 81. In concluding that there was no CUTPA violation, our Supreme Court stated that the defendant "expressly retained the right not to proceed with the acquisition. Thus, [a]lthough the plaintiffs hoped and even expected that [the defendant] would [complete the acquisition], [the defendant] was under no statutory or contractual obligation to do so. Under those circumstances, [the defendant] did not violate CUTPA by declining to do that which it simply was not required to do. The analysis does not differ because the plaintiffs, effectively, gambled on an expectation that [the defendant] would choose to proceed differently than it did and, subsequently, lost that gamble." (Internal quotation marks omitted.) Id., 83–84.

In the present case, the defendants' behavior in not hiring the plaintiff to produce the new heating plates it had designed to implement the nationwide rollout of the Flatizza, unlike that of the defendants in *Johnson Electric Co.* in declining to hire the plaintiff as a subcontractor on the project for which it had bid successfully on the basis of the plaintiff's quote, did not violate any established trade or industry practice or public policy,

as discussed in the part I A of this opinion, or thus qualify, on that basis, as "immoral, unethical, oppressive or unscrupulous"; (internal quotation marks omitted) *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, supra, 72 Conn. App. 357; under the second prong of the cigarette rule. Rather, like the defendant in *Glazer* that declined to provide financing for or to buy out the plaintiff's company, the defendants here, by not hiring the plaintiff to manufacture the new heating plates for the rollout of the Flatizza, merely declined to do something that they were not legally required to do despite the disappointed plaintiff's hope or expectation to the contrary.

As for taking the plaintiff's design to a competitor with ties to the defendant companies, for the same reasons articulated in part I A of this opinion, there was nothing "immoral, unethical, oppressive or unscrupulous"; (internal quotation marks omitted) *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, supra, 72 Conn. App. 357; about the defendants' behavior, for it did not infringe on the plaintiff's rights in any way and involved no more than taking a legally unprotected product, which the defendants had duly purchased and therefore owned without restriction, to another manufacturer to improve upon its design and, so improved, to manufacture and sell it. We conclude that such fully lawful conduct was not immoral, unethical, oppressive or unscrupulous in any way, and thus did not violate the second prong of the cigarette rule.

C

The third prong of the cigarette rule requires us to consider whether the defendants' actions caused substantial injury to the plaintiff. Under this prong, "[t]o justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided." (Internal quotation marks omitted.) *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 569–70, 473 A.2d 1185 (1984).

The plaintiff alleges that the injury it suffered as a result of the defendants' conduct was the loss of an expected order of approximately 25,000 plates. We agree with the trial court that this loss was substantial for the plaintiff, at a price of $67.27 per plate. There are no facts to suggest that the cost savings for the defendants in purchasing from VTM Concepts in any way passed through to the consumer so as to establish a countervailing benefit that outweighs the injury. We agree with the trial court, however, that this injury was one that the plaintiff reasonably could have avoided by the simple expedient of obtaining a confidentiality agreement or some other stopgap measure to protect its product design until the patent it had applied for was

issued. This is especially true considering that Doctor's Associates had the plaintiff sign a nondisclosure agreement at the outset of their business relationship, at which point the plaintiff could have requested such an agreement to protect their design in return. Instead, by proceeding without such protection for its work product, the plaintiff freely allowed the defendants to take its design to a competitor that might in turn refine it or simply manufacture it, with or without refinements, more cheaply. Because this result reasonably could have been avoided, the plaintiff fails to meet the third requirement of the third prong of the cigarette rule.

In conclusion, because the plaintiff's claims fail to meet any prong of the cigarette rule, we agree with the trial court's conclusion that there is no genuine issue of material fact that the defendants committed no unfair acts or practices in violation of CUTPA.

## II

The plaintiff next claims that the court improperly concluded that there was no genuine issue of material fact as to whether the defendants' conduct constituted a deceptive act or practice under CUTPA. We disagree.

An act or practice is deceptive if three requirements are met. "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material—that is, likely to affect consumer decisions or conduct." (Internal quotation marks omitted.) *Caldor, Inc.* v. *Heslin*, 215 Conn. 590, 597, 577 A.2d 1009 (1990), cert. denied, 498 U.S. 1088, 111 S. Ct. 966, 112 L. Ed. 2d 1053 (1991). "[A] party need not prove an intent to deceive to prevail under CUTPA." *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 106, 612 A.2d 1130 (1992).

Here, the plaintiff alleges that the defendants misrepresented to the plaintiff that it would receive a contract for a large order of heating plates. As discussed in part I of this opinion, however, there is no evidence of any misrepresentation, omission, or practice likely to mislead the plaintiff to believe that it would receive such a contract. The parties negotiated the details of a potential order for a prolonged period of time, but there is no evidence that the defendants made any misrepresentations during that period. To the extent that the plaintiff is arguing that the defendants should have informed it explicitly that they were soliciting bids from others and that one potential bidder had been given its design upon which to formulate its own bid, such omissions do not amount to a CUTPA violation because the defendants were under no duty to so inform it.

"[Our Supreme Court has] held that [a] failure to disclose can be deceptive only if, in light of all the

circumstances, there is a duty to disclose." (Internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.*, supra, 274 Conn. 84. "Regarding the duty to disclose, the general rule is that . . . silence . . . cannot give rise to an action . . . to set aside the transaction as fraudulent. Certainly this is true as to all facts which are open to discovery upon reasonable inquiry." (Internal quotation marks omitted.) Id. "A duty to disclose may be imposed by statute or regulation . . . or such a duty may arise under common law." (Citation omitted.) Id., 85. As correctly noted by the defendants Doctor's Associates and Franchise, the plaintiff has not identified any basis for imposing a duty upon them to disclose the details of the bidding process, and we have found no authority establishing such a duty under these circumstances. Therefore, the defendants did not commit a deceptive act or practice by that omission. For these reasons, we conclude that the defendants were also entitled to summary judgment on the plaintiff's claims that they committed deceptive acts or practices in violation of CUTPA.

### III

The plaintiff's final claim is that the court erred in concluding that there was no genuine issue of material fact as to whether the defendants were unjustly enriched to the plaintiff's detriment by the defendants' alleged conduct. Specifically, it argues that the defendants were unjustly enriched by retaining the benefit of the research and development efforts that the plaintiff put into the design of the new heating plate.

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 451–52, 970 A.2d 592 (2009).

Although the defendants benefited from the time and effort it took the plaintiff to design the custom heating plate prototype, there is no evidence that they did not compensate the plaintiff fully for that benefit. To the contrary, there is evidence that the defendants paid the

plaintiff several times, each time they purchased one or more plates for product and market testing. The plaintiff could have charged the defendants higher prices when it sold the defendants those plates for the labor and time it had spent developing the designs for them. The fact that it elected not to do so and that the design of the new plate was not protected does not convert the time it spent perfecting that design into an unpaid for benefit for which compensation is due to it in equity from the defendants. Because there is no evidence that the defendants failed to pay the plaintiff for any benefit they received, we conclude that the court did not err in rendering summary judgment for the defendants on the plaintiff's unjust enrichment claim.

The judgment is affirmed.

In this opinion the other judges concurred.

————————————————